Julaine K. APPLING, Jo Egelhoff, Jaren E. Hiller, Richard Kessenich and Edmund L. Webster, Plaintiffs-Appellants,†

v.

James E. DOYLE, Karen Timberlake and John Kiesow, Defendants-Respondents,

FAIR WISCONSIN, INC., Glenn Carlson, Michael Childers, Crystal Hyslop, Janice Czyscon, Kathy Flores, Ann Kendzierski, David Kopitzke, Paul Klawiter, Chad Wege and Andrew Wege, Intervening Defendants-Respondents.

Court of Appeals

*No. 2011AP1572. Submitted on briefs May 18, 2012.
—Decided December 20, 2012.*

2013 WI App 3

(Also reported in 826 N.W.2d 666.)

† Petition for Review filed.

On behalf of the plaintiffs-appellants, the cause was submitted on the briefs of *Michael D. Dean* of *First Freedoms Foundation, Inc.*, Brookfield; *Richard*

763

*Esenberg* of Mequon; *Austin R. Nimocks* of *Alliance Defense Fund*, Washington, D.C.; and *Brian W. Raum* of *Alliance Defense Fund*, Scottsdale, Arizona.

On behalf of the intervening defendants-respondents, the cause was submitted on the brief of *Brian E. Butler* and *Barbara A. Neider* of *Stafford Rosenbaum LLP*, Madison, and *Christopher R. Clark* of *Lambda Legal Defense & Education Fund*, Chicago, Illinois.

A nonparty brief was filed by *Dyann L. Hafner*, assistant corporation counsel, and *Marcia MacKenzie*, corporation counsel, of *Office of the Dane County Corporation Counsel*, Madison, for Dane County.

A nonparty brief was filed by *Laurence J. Dupuis* of *ACLU of Wisconsin Foundation, Inc.*, Milwaukee; *John A. Knight* of *American Civil Liberties Union Foundation*, Chicago, Illinois; *Linda E.B. Hansen* and *Daniel A. Manna* of *Foley & Lardner LLP*, Milwaukee; and *David B. Goroff* of *Foley & Lardner LLP*, Chicago, Illinois, for *American Civil Liberties Union*.

Before Lundsten, P.J., Higginbotham and Brennan, JJ.

¶ 1.   LUNDSTEN, P.J.   Wisconsin's marriage amendment, ratified by voters in 2006, declares that the only "marriage" recognized in Wisconsin is a marriage "between one man and one woman." The amendment prohibits same-sex couples from entering into a "legal status identical or substantially similar to that of marriage." WIS. CONST. art. XIII, § 13.

¶ 2.   In 2009, our legislature passed a domestic partnership law, WIS. STAT. ch. 770.[1] This law creates

---

[1] All references to the Wisconsin Statutes are to the 2009–10 version.

the "legal status" of "domestic partnership" that carries with it some of the same rights and obligations accorded marriage.

¶ 3.   Julaine Appling and other plaintiffs (collectively Appling, except where we refer to Julaine Appling individually) filed suit challenging the constitutionality of the domestic partnership law. Fair Wisconsin, Inc. and ten individuals (collectively Fair Wisconsin) intervened as defendants.[2] Appling contends that the domestic partnership law violates the marriage amendment because the partnership law creates a "legal status" that is "substantially similar to that of marriage." We agree with the circuit court that it does not.

¶ 4.   Appling has the burden of showing that the domestic partnership law is unconstitutional beyond a reasonable doubt. As explained further below, Appling must demonstrate, by reference to the language of the marriage amendment and other voter-intent evidence, that voters intended to prohibit the particular type of domestic partnership created by the legislature. We conclude that Appling falls far short of meeting her burden. As we shall see, there is little reason to think informed voters believed that the marriage amendment language would prohibit the domestic partnerships at issue here. The same-sex domestic partnerships created by the legislature are substantially different than mar-

---

[2] The defendants, James E. Doyle, Karen Timberlake, and John Kiesow, are unrepresented on appeal. The Attorney General has declined to defend the domestic partnership law and, following a change in gubernatorial administrations, the appointed counsel for the defendants likewise declined to defend the law. Accordingly, the task of defending the law fell solely to the intervening defendants-respondents, Fair Wisconsin and the other named intervenors. Amici briefs have been filed in support of the domestic partnership law by Dane County and, jointly, by the American Civil Liberties Union and five lesbian couples.

riages because, among other differences, domestic partnerships carry with them substantially fewer rights and obligations than those enjoyed by and imposed on married couples.[3]

¶ 5.   This case is not about whether the Wisconsin or United States Constitutions require, on equal protection or other grounds, that same-sex couples have the right to a legally recognized relationship that is identical or substantially similar to marriage. To the contrary, for the domestic partnership law to pass muster here, the "legal status" created by that law may not be "substantially similar" to the "legal status" of marriage. Because the legal and evidentiary arguments of the parties persuade us that the two are not "substantially similar," we affirm the circuit court's decision holding that the domestic partnership law does not violate the marriage amendment.

### Background

¶ 6.   During the 2003 and 2005 legislative sessions, successive legislatures passed joint resolutions which resulted in putting the following proposed constitutional amendment before the voters:

> Only a marriage between one man and one woman shall be valid or recognized as a marriage in this state.

---

[3] We use the term "rights and obligations" as our shorthand in this opinion. The parties use several terms in various combinations. Fair Wisconsin often uses "rights, benefits, and responsibilities," but not always. Appling most commonly uses "rights" and "rights or benefits," but also uses "duties" and other terms. We perceive no dispute in this regard. All of these terms are intended as shorthand references to specifics in the Wisconsin statutes that apply after the formation of a marriage or a domestic partnership.

A legal status identical or substantially similar to that of marriage for unmarried individuals shall not be valid or recognized in this state.

On November 7, 2006, a majority of voters ratified this amendment by voting yes.

¶ 7. Three years later, in 2009, the Wisconsin legislature created a chapter in the Wisconsin statutes establishing domestic partnerships as an option for same-sex couples. WISCONSIN STAT. ch. 770 contains eligibility requirements and prescribes the manner in which such partnerships are formed and terminated. Chapter 770 does not specify the rights and obligations of domestic partnerships. The mechanism the legislature chose for conferring rights and obligations was to select a subset of rights and obligations found in other parts of the statutes that already apply to marriages and then indicate, in the text of those other statutes, that they apply to domestic partnerships. For example, WIS. STAT. § 861.21(2), the statute assigning to a surviving spouse his or her decedent spouse's interest in their home, was made applicable to domestic partnerships.

¶ 8. Appling brought this action to challenge the constitutionality of the domestic partnership law. Appling and Fair Wisconsin both moved for summary judgment and the circuit court granted judgment in favor of Fair Wisconsin, declaring that the domestic partnership law does not violate the marriage amendment. Appling appeals.

### General Legal Framework

¶ 9. We review a circuit court's decision on summary judgment de novo, applying the same standard as the circuit court. *Sherry v. Salvo*, 205 Wis. 2d 14, 21,

767

555 N.W.2d 402 (Ct. App. 1996). Under summary judgment methodology, "[i]f there is no dispute as to the material facts or inferences, . . . summary judgment is appropriate and we proceed to [resolve the dispute by considering] the legal issue or issues raised by the [summary judgment] motion." *Id.* at 21 n.3. Here, there is no dispute about the facts and, accordingly, we focus on the parties' legal disputes and the application of law to the undisputed facts.

■

¶ 10.  Appling challenges the constitutionality of legislation and, therefore, has the burden of showing, beyond a reasonable doubt, that the legislation violates the constitution. *See Norquist v. Zeuske*, 211 Wis. 2d 241, 250, 564 N.W.2d 748 (1997). The burden is placed on challengers to legislative acts because "[a]ll legislative acts are presumed constitutional and every presumption must be indulged to uphold the law if at all possible." *Id.* This court may not concern itself with the wisdom of the legislation—our only concern is with whether the legislation clearly contravenes the constitution. *State v. Cole*, 2003 WI 112, ¶ 18, 264 Wis. 2d 520, 665 N.W.2d 328.

¶ 11.  The challenge to the legislation here requires us to interpret the meaning of a constitutional amendment ratified by voters. Consequently, our task is to construe the amendment "to give effect to the intent . . . of the people who adopted it." *Dairyland Greyhound Park, Inc. v. Doyle*, 2006 WI 107, ¶ 19, 295 Wis. 2d 1, 719 N.W.2d 408. We examine three sources to determine voter intent: "the plain meaning, the constitutional debates and practices of the time, and the earliest interpretations of the provision by the legislature, as manifested through the first legislative action following adoption." *Id.* In contrast with statutory con-

struction, we do not stop with an analysis of the text, even if that analysis reveals unambiguous language. *See Buse v. Smith*, 74 Wis. 2d 550, 568, 247 N.W.2d 141 (1976).

¶ 12.   An examination of the first source, "plain meaning," requires a search for the ordinary meaning of the amendment's language. "Courts should give priority to the plain meaning of the words of a constitutional provision in the context used. The plain meaning of the words is best discerned by understanding their obvious and ordinary meaning at the time the provision was adopted, taking into account other (especially contemporary) provisions of the constitution." *Dairyland*, 295 Wis. 2d 1, ¶ 117 (Prosser, J., concurring in part, dissenting in part) (citations omitted).

¶ 13.   The second source of voter intent is "the constitutional debates and practices of the time." This inquiry includes examining the debates surrounding the amendment, including statements from legislators as well as public statements made during the ratification campaign by other persons knowledgeable about the amendment. *See id.*, ¶ 24 (majority opinion) (examining the "legislative debates and the ratification campaign" of the amendment in question). Public statements meant to educate the public by what appear to be knowledgeable persons are an indicator of voter understanding of the amendment. *See id.*, ¶ 37 ("[T]he information used to educate the voters during the ratification campaign provides evidence of the voters' intent."). Appling fittingly characterizes this inquiry as a look at the "historical context surrounding . . . passage" of the marriage amendment. We adopt "historical context of passage" as our shorthand for this second source.

¶ 14.   The third source that might shed light on voter intent is the "earliest interpretations of the pro-

769

vision by the legislature." It is sometimes the case that legislative action expresses or assumes a particular understanding of the constitutional provision at issue and, in that situation, the legislature's express or implicit understanding is an indicator of voter intent. *See id.*, ¶¶ 19, 45–48 (examining the "earliest interpretations of the [amendment] by the legislature, as manifested through the first legislative action following adoption").

¶ 15.   In sum, Appling bears the burden of showing, beyond a reasonable doubt, that the domestic partnership law is unconstitutional. In the context of this case, where the constitutionality of the legislation hinges on the meaning of the marriage amendment, Appling must show unconstitutionality beyond a reasonable doubt by persuading us that the voters who ratified the marriage amendment intended that it would ban the particular type of same-sex partnerships created by the domestic partnership law. To determine the voters' intent, we look to the "plain meaning," the "historical context of passage," and the "earliest interpretations" by the legislature.

¶ 16.   In the discussion below, we first explain why the language interpretation dispute that matters is the one over the meaning of the term "legal status." We then look to the three sources of voter intent to determine the meaning of that term. Finally, we apply our interpretation of the marriage amendment to the domestic partnership law.

### Discussion

¶ 17.   The question presented is whether the domestic partnership law violates the marriage amendment, which prohibits a "legal status identical or sub-

770

stantially similar to that of marriage." Appling and Fair Wisconsin dispute the meaning of the two key terms in this clause: "legal status" and "substantially similar."

¶ 18. We need not, however, resolve the parties' dispute over the meaning of "substantially similar."[4] The reason is that, even if we assume for purposes of this opinion that "substantially similar" has the more expansive meaning Appling gives the term, Appling's constitutional challenge fails because she applies her take on "substantially similar" to an incorrect interpretation of the term "legal status."

¶ 19. Understanding why Appling's incorrect interpretation of the term "legal status" dooms Appling's constitutional challenge requires understanding Appling's overall argument. Appling's analysis proceeds as follows:

1. The legislature may not create a "legal status" that is "substantially similar" to marriage.

2. The term "legal status" encompasses only the *eligibility* and *formation* requirements of marriages and domestic partnerships, not the rights and obligations that come with these relationships.

3. Because "legal status" refers only to eligibility and formation, the constitutionality of the domestic partnership law is measured solely by determining

---

[4] Neither Appling nor Fair Wisconsin suggests that "substantially similar" has a technical meaning that is not apparent from the common usage of the phrase itself. Appling asserts that "substantially similar" means "strong resemblance" or "closely comparable." Fair Wisconsin contends that "substantially similar" means "close to identical." Although we need not resolve this dispute, we observe that it is not apparent what these alternative formulations add to the straightforward term "substantially similar."

> whether the eligibility and formation requirements of marriage and domestic partnerships are "substantially similar."

4. A comparison of the eligibility and formation requirements of marriage with the eligibility and formation requirements of domestic partnerships shows that they closely parallel each other and, thus, are "substantially similar."

Under this analysis, it is not necessary to compare the rights and obligations of marriage with the rights and obligations of domestic partnerships. This is critical to Appling's constitutional challenge because, if the correct interpretation of "legal status" includes rights and obligations, it is readily apparent that the "legal status" of marriage and the "legal status" of a domestic partnership are not "substantially similar" and that this is true regardless of the precise meaning of "substantially similar." In fact, Appling does not even attempt to argue that the legal statuses of the two relationships are "substantially similar" if rights and obligations are taken into account.

¶ 20. Appling's implicit concession that there are substantial differences between marriage and domestic partnerships when it comes to rights and obligations is appropriate for reasons discussed later in this opinion.[5] Our point here is that Appling's concession on this topic means that, if we disagree with Appling's interpretation of "legal status," then Appling's assertion of unconstitutionality necessarily falls, regardless of the parties' dispute over the meaning of "substantially similar." Accordingly, the primary focus of this opinion is on the meaning of "legal status."

---

[5] Appling completely ignores differences in termination procedures. The differences in this respect, as discussed later in this opinion, are also substantial.

## I. Meaning Of "Legal Status"

¶ 21. Under Appling's view, "legal status" refers solely to eligibility and formation requirements of marriages and domestic partnerships. Thus, according to Appling, our task is limited to comparing the eligibility and formation requirements of marriages with the eligibility and formation requirements of domestic partnerships and then, based on this limited comparison, determining whether they are "substantially similar."

¶ 22. Fair Wisconsin argues that voters understood the term "legal status" to more broadly refer to all legal aspects of marriages and domestic partnerships, including eligibility, formation, and termination requirements, along with the rights and obligations of such relationships.

¶ 23. To resolve this dispute, we examine the three sources used to ascertain voter intent.

### A. First Source: Plain Meaning

¶ 24. We agree with Appling that, to properly assess the plain meaning of the term "legal status," that term must be viewed in context. The issue here is not the generic meaning of "legal status," but rather, as Appling contends, its meaning as used in the constitutional phrase "[a] legal status identical or substantially similar to that of marriage."

¶ 25. We further agree with Appling that dictionary definitions are not helpful because they define only the generic terms "legal" and "status," and there is no mystery about the general meaning of these terms.[6]

---

[6] According to Webster's Third New International Dictionary, for instance, "legal" means "of or relating to law," and "status" means "the condition (as arising out of age, sex, mental

Rather, as Appling asserts, the answer here lies in the context in which these words are used. We disagree, however, with Appling on what that context reveals.

¶ 26. In Appling's view, the term "legal status" is a reference to the eligibility and formation requirements for a marriage, but not to the rights and obligations incident to a marriage. The eligibility requirements to which Appling refers include things such as limitations based on age, ability to consent, and consanguinity. The formation requirements refer primarily to the process for obtaining a marriage license. And, following this logic, all that matters, for purposes of examining the "legal status" created by the domestic partnership law, are the eligibility and formation requirements of attaining the status. We are not persuaded for three reasons.

¶ 27. First, the marriage amendment text does not use the phrase "legal status of being married." It speaks, rather, about the "legal status . . . of marriage." What comes to mind when thinking about the legal status *of* marriage is not only the formation process, but also the rights and obligations of marriage, along with the prospect that terminating the relationship means going through a legal divorce proceeding before a court.

¶ 28. Second, Appling's "legal status" argument does not comport with common sense because it asks us to believe that informed voters drew a distinction between status and what comes with that status. By this logic, people think of lawyers as having the status of being lawyers, and separately think about lawyers as being professionals authorized to practice law. It would

incapacity, crime, alienage, or public station) of a person that determines the nature of his legal personality, his legal capacities, and the nature of the legal relations to the state or to other persons into which he may enter." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1290, 2230 (unabr. ed. 1993).

follow, under Appling's thinking, that a law prohibiting the creation of a "legal status" substantially similar to "lawyer" would be understood by average voters as solely pertaining to the requirements for becoming a lawyer, without imposing restrictions on the practice of law by non-lawyers. This compartmentalization of status and what comes with status does not match how people think and talk about statuses, such as being a lawyer, being in a business partnership, being a mayor, or, of course, being married.

¶ 29.  Third, it is unreasonable to think that "legal status" excludes reference to the rights and obligations of marriage because that would mean that voters thought the marriage amendment would permit legally recognized same-sex-couple relationships that are formed with criteria different than marriage criteria but carry with them all the rights and obligations that attend marriage—in other words, marriage by another name. This third reason requires further explanation.

¶ 30.  Appling does not dispute that the marriage amendment permits the legislature to identify eligible same-sex couples and give them the right to obtain the status of "domestic partnership," carrying with it rights and obligations like those that attend marriage. That is, Appling does not contend that the marriage amendment is a blanket prohibition on domestic partnerships. Rather, Appling contends that the particular domestic partnership law at issue here is unconstitutional because the means it uses to identify eligible couples and formalize their relationships is too similar to the corresponding requirements of marriage.

¶ 31.  When we combine Appling's concession—that at least some types of domestic partnerships would be permissible under the marriage amendment—with Appling's "legal status" argument—that the particular

rights and obligations that go with domestic partnerships are irrelevant when it comes to "legal status"—the result is nonsense. It is nonsense because it assumes a voter would read the amendment language to allow the legislature to identify eligible same-sex couples using some criteria, give them the right to obtain legal recognition as a same-sex couple, and then confer on that status *all* the rights and obligations of marriage. Such a scenario, permissible under Appling's theory, is the very definition of marriage by another name.

¶ 32. This is not just our interpretation of Appling's argument—she says as much. Appling states that the legislature could "accord[] all of marriage's legal incidents to every Wisconsin citizen" without violating the marriage amendment. We observe that, because it makes no sense to accord all of marriage's legal incidents to citizens individually, Appling's flawed position must be that the legislature has unrestricted freedom to create legally recognized same-sex relationships carrying with them all of the rights and obligations of marriage, so long as that legal recognition does not consist of substantially similar eligibility and formation requirements.

¶ 33. Plainly, the voters who ratified the marriage amendment could not have had this in mind. Rather, the only reasonable conclusion based on the language of the amendment is that voters thought about the "legal status" of marriages and domestic partnerships as a whole picture, including eligibility, formation, and termination requirements, along with the rights and obligations that attend marriage.

¶ 34. Appling makes two additional arguments relating to the amendment's language, and we now turn to them.

776

¶ 35.   First, Appling argues that it makes no sense to look at the rights and obligations of marriage because the "legal status" of being married does not depend on these particular rights and obligations. Appling correctly notes that we do not compare rights and obligations attending marriage in other jurisdictions when determining whether Wisconsin will recognize marriages formed in other jurisdictions. Rather, as Appling points out, we follow the general rule that "[m]arriages valid where celebrated are valid everywhere . . . ." *Campbell v. Blumberg*, 260 Wis. 625, 631, 51 N.W. 709 (1952).

¶ 36.   The simple response to Appling's cross-jurisdictional-recognition argument is that it adds nothing to her assertion that the plain meaning of "legal status" involves solely the status of being married. It is true, and likely widely understood, that Wisconsin recognizes marriages formed in other jurisdictions, regardless what rights and obligations attend marriage in such jurisdictions.[7] But this does not provide a reason to think that voters took the narrow view of "legal status" that Appling now advances. Rather, as we have explained, voters would have understood that,

[7] Appling relies on *Xiong v. Xiong*, 2002 WI App 110, 255 Wis. 2d 693, 648 N.W.2d 900, and *Forbes v. Forbes*, 226 Wis. 477, 277 N.W. 112 (1938), for their legal discussions of the circumstances under which Wisconsin recognizes a marriage formed in other jurisdictions. Appling also points to *National Pride at Work, Inc. v. Governor of Michigan*, 748 N.W.2d 524, 534 (Mich. 2008), for the proposition that legal status does not include rights and responsibilities of marriage. Although *National Pride* addresses the meaning of a marriage amendment, the language at issue was very different. Michigan's marriage amendment more broadly prohibits recognition of "similar union[s]" to marriage. *See id.* at 532–43.

regardless of differences in rights and obligations, the "legal status" of marriage is a phrase that includes reference to the substantial rights and obligations that go with marriage and that, if the legislature conferred those *same* rights and obligations on same-sex couples, however such couples are identified, the resulting legally recognized relationship would be substantially similar to marriage.

¶ 37. Moreover, Appling's cross-jurisdictional-recognition argument inadvertently highlights a significant difference between marriages and Wisconsin domestic partnerships, namely, that the two relationships are starkly different when it comes to cross-jurisdictional recognition. Although Wisconsin recognizes marriages formed in other jurisdictions, and Wisconsin marriages are likewise recognized in other jurisdictions, the same cannot be said of domestic partnerships. The rights and obligations accorded domestic partnerships are limited to domestic partnerships formed under Wisconsin's domestic partnership law.[8] Wisconsin does not recognize domestic partnerships or civil unions formed in other jurisdictions. When it comes to cross-jurisdictional recognition, marriages and domestic partnerships bear no resemblance.

¶ 38. Appling's second additional "plain meaning" argument is her contention that, if we define "legal

---

[8] WISCONSIN STAT. ch. 770 creates a status that carries with it solely specified rights and obligations enforceable under Wisconsin law. *See* WIS. STAT. § 770.01(2) (" 'Domestic partnership' means the legal relationship that is formed between 2 individuals under this chapter."); and *see, e.g.,* WIS. STAT. § 301.38(1)(a) (including a "domestic partner under ch. 770" as a member of the family for purposes of victim notification of prisoner escapes); WIS. STAT. § 851.08 (" 'Domestic partner' has the meaning given in s. 770.01(1)" for purposes of intestacy and probate statutes).

status" in the marriage amendment to include rights and obligations, our holding will have a destabilizing effect on determining which couples are married. According to Appling, if "marital status" is determined in part by the rights and obligations accorded to it, the "legal status of marriage will vary, at the whim of the legislature, as the incidents of marriage are changed." This argument is meritless.

¶ 39. Regardless how "legal status" is interpreted with respect to comparing marriages to domestic partnerships, the marriage amendment cannot reasonably be read as altering settled law regarding the recognition of marriages between a man and a woman formed in Wisconsin or other jurisdictions. Appling's flawed premise is that there is no difference between being legally married and the "legal status" of marriage as the term "legal status" is used in the marriage amendment. Because the two concepts are plainly not the same, the problem Appling purports to identify does not exist.[9]

¶ 40. In sum, the plain meaning of the marriage amendment supports the conclusion that "legal status" refers not only to eligibility and formation requirements, but also to rights and obligations and, for that matter, termination requirements.

---

[9] We have considered Appling's argument that it is significant that neither WIS. STAT. ch. 765 (governing marriage formation) nor WIS. STAT. ch. 770 (governing domestic partnership formation) discusses rights and obligations associated with marriage or domestic partnerships. Appling, however, fails to explain why this fact means that "legal status" does not include rights and obligations. We discern no logical reason why the fact that the rights and obligations incident to marriage and those incident to domestic partnerships are found in chapters other than ch. 765 and ch. 770 means that such rights and obligations are not part of the "legal status" of these relationships.

## B. Second Source: Historical Context Of Passage

¶ 41. We now look to the second source used to discern voter intent, the historical context of passage. As to this source, the parties focus their attention on the statements of proponents and opponents of the marriage amendment, both during the legislative process and during the lead-up to ratification by voters. However, before analyzing this public discourse, we must first address whether *opponent* statements are relevant and, if so, whether those statements should be given less weight than the statements of successful proponents.

¶ 42. Fair Wisconsin complains that Appling relies on statements made by opponents of the amendment, but that she does not provide legal authority for the proposition that opponent statements are relevant. We are uncertain whether Fair Wisconsin means to suggest that the views of opponents should be given no weight or just less weight.

¶ 43. If Fair Wisconsin means to suggest that opponent statements are never relevant, we disagree. At least on occasion, courts have looked to opponent statements. *See, e.g., Dairyland,* 295 Wis. 2d 1, ¶ 233 (Prosser, J., concurring in part, dissenting in part) ("Based on the evidence at hand, it would be hard to argue that either the proponents or opponents of the amendment expected or intended the immediate closure of Indian casinos."); *Thompson v. Craney,* 199 Wis. 2d 674, 687–88, 546 N.W.2d 123 (1996) (relying on "comments of a delegate opposing the amendment of 1846").

¶ 44. If Fair Wisconsin means to suggest that opponent statements should generally be given less weight, it appears the parties are in agreement. Appling writes: "[T]he views of an amendment's proponents are usually privileged over those of its opponents . . . ."

780

We agree with Appling that, generally speaking, it makes sense to place more weight on the statements of successful proponents because, after all, the most reasonable assumption is that the proponents' view prevailed with voters.[10]

¶ 45. When, then, should we give equal weight to the statements of opponents? The only situation Appling suggests is when proponent and opponent statements reflect a "congruence" of views or "a common core understanding of the meaning or impact of the amendment." Appling uses these terms to describe the situation here. We agree with Appling's general legal premise, but disagree that there was a congruence of views among proponents and opponents.

¶ 46. Appling's congruence-of-views argument fails in its application to the instant facts because it equates two very different themes. Appling compares opponent statements warning that the marriage amendment would prohibit all domestic partnerships with proponent statements assuring voters that the marriage amendment is about preserving a one man/one woman marriage and not about benefits.[11]

[10] Appling relies on *State ex rel. Martin v. Heil*, 242 Wis. 41, 55, 7 N.W.2d 375 (1942), for her assertion that, "[w]hile *the views of an amendment's proponents are usually privileged over those of its opponents,* where congruence exists as to the meaning of the enacted provision at issue, there is [] no need for a distinction at law" (emphasis added; citation omitted). We agree that the italicized portion of Appling's statement is a sensible proposition, but we find no clear support for it in *Heil*.

[11] Appling accurately identifies several examples of public statements by opponents asserting, in effect, that the second sentence of the marriage amendment was inserted to accomplish a complete ban on domestic partnerships. One representative example is in a 2006 post on Fair Wisconsin's "No on the Amendment Blog," where Fair Wisconsin represented that

However, asserting that the marriage amendment would prohibit domestic partnerships is completely different than telling voters that the marriage amendment is not about prohibiting benefits to non-married couples. The first warns voters that *all* domestic partnerships will be prohibited, and the second assures voters that *some* domestic partnerships, carrying with them at least some of the same rights and obligations as marriages, will be allowed. For example, when Appling points to a proponent's debate statement that the marriage amendment is "about preserving a one man, one woman marriage" and "not about benefits," Appling fails to acknowledge that the speaker was attempting to assure voters that the amendment was "not about [denying some subset of] benefits" to same-sex couples.[12]

---

voting "yes" on the amendment would amount to a "ban on . . . the legal recognition of relationships that are similar to marriage—that includes civil unions and domestic partnerships." So far as the record before us discloses, this was a consistent theme in the statements of marriage amendment opponents.

We disagree with Fair Wisconsin's assertion that opponents "simply warned voters that the Marriage Amendment's second sentence would invite legal challenges from anti-gay groups and could, therefore, threaten important benefits." Although some opponent statements are phrased in terms of a warning that the amendment would lead to legal challenges, thereby suggesting that the result of such challenges was in doubt, our review of the record reveals that many opponents adopted the strategy of warning that the marriage amendment *would* ban domestic partnerships and civil unions.

[12] This example represents a consistent pattern in Appling's appellate briefing. In her argument before us now, Appling asserts that statements from proponents of the marriage amendment "were focused on *legal statuses* and unconcerned with whether the incidents of marriage [could] be accorded to others" (emphasis in original). Appling asserts that proponents

¶ 47. There is an additional closely related reason why Appling's attempt to give equal weight to opponent statements must fail. By Appling's faulty logic, voters who favored the amendment disbelieved the assurances of proponents, believed the warnings of opponents, and then voted with the proponents. This makes little sense. Rather, the more reasonable and obvious conclusion is that voters who ended up favoring the amendment were, generally speaking, persuaded by statements of the proponents, including proponent assurances of the amendment's effect on domestic partnerships.

¶ 48. What is left is the parties' apparent agreement with the general proposition that we should place more weight on the statements of successful proponents. Accordingly, we look to these statements to glean voter intent. We will not attempt to summarize all of the statements of proponents. Rather, we look to a representative sampling of those statements that speak most directly to the question at hand.

¶ 49. In a 2004 joint press release, Senator Scott Fitzgerald and Representative Mark Gundrum, two of the sponsors of marriage amendment legislation, explained that the amendment prohibited " '[c]reating a technical "marriage," but just using a different name, to

argued that the amendment would not prohibit any particular privileges or benefits, "so long as they were not accorded on the basis of a legal status that was substantially similar to that of marriage." Similarly, Appling now characterizes proponents as being clear that the marriage amendment would "not restrict extending rights or benefits to non-spouses," but would "prevent[] the creation of a legal status that strongly resemble[s] marriage," as the domestic partnership law does here. However, as we shall see, during the ratification campaign, proponents were clearly *not* unconcerned with whether the rights and obligations of marriage could be conferred on domestic partnerships.

massage public opinion.'" The press release further explained what the amendment would not do: "[T]he language does *not* prohibit the legislature ... from extending particular benefits to same-sex partners as those legal entities might choose to do." (Emphasis in original.)

¶ 50. That same year, a Wisconsin Legislative Council attorney provided legislators with a memo predicting that the legality of domestic partnerships, after passage of the marriage amendment, would involve looking at whether "substantially all of the legal aspects of marriage" would be conferred:

> It may be reasonable to speculate that in interpreting the language [of the amendment], a court might determine the purpose of the provision is to prevent this state from sanctioning what is effectively a civil marriage between unmarried individuals where the arrangement is designated by some other name. *Under this interpretation, a court might look to whether substantially all of the legal aspects of marriage are conferred,* i.e., whether the legal status conferred is essentially intended to be the functional equivalent of marriage or something less than marriage that is not "substantially similar" to marriage.[13]

(Emphasis added.)

¶ 51. A 2005 Milwaukee Journal Sentinel article quoted senate co-sponsor Fitzgerald as saying that "civil unions" would be permitted and such unions could be accorded rights and obligations:

---

[13] This memo, and another from the Legislative Council we discuss later, was brought to our attention by Fair Wisconsin. Appling does not argue that the memos are irrelevant. We conclude that the Legislative Council memos, regardless how widely circulated, are relevant because they provide context for public statements of legislators.

784

Fitzgerald said the proposed amendment's second sentence was necessary to clarify what kind of marriage would be recognized in Wisconsin. He said the amendment leaves open the possibility that the Legislature could someday define civil unions.

"The second clause sets the parameters for civil unions," Fitzgerald said. "Could a legislator put together a pack of 50 specific things they would like to give to gay couples? Yeah, they could."

¶ 52.   In 2006, the Legislative Council provided a second legal memo at the request of Representative Gundrum. The memo advised Representative Gundrum that the second sentence of the amendment lends "strong support" to the proposition that the amendment language prohibits "the recognition of Vermont-style civil unions or a similar type of government-conferred legal status for unmarried individuals that purports to be the same as or nearly the same as marriage in Wisconsin."[14] Shortly thereafter, Representative Gundrum was quoted in a newspaper as stating:   " 'To date, there has been no court in the entire country that has

[14] There is no dispute that, at the time, "Vermont-style civil union" was a reference to same-sex unions that carried with them essentially all of the rights and obligations of marriage that a state could confer. The references were to a Vermont law passed in response to the Vermont supreme court's decision holding that same-sex couples were entitled to eligibility for a legal status that affords such couples "the same benefits and protections afforded by Vermont law to married opposite-sex couples." *Baker v. State*, 744 A.2d 864, 886 (Vt. 1999). The result was the Vermont "civil union" law, which confers on parties to a civil union "all the same benefits, protections, and responsibilities . . . as are granted to spouses in a civil marriage." VT. STAT. ANN. tit. 15, § 1204. Appling states in her brief that the marriage amendment "was enacted in response to marriage-mimicking statuses being created in other states," and she gives as her primary example the Vermont law.

ruled that any of these amendments [banning same-sex marriage in other states] were intended or do prevent domestic partner benefits' " (bracketed material in original).

¶ 53. In a 2006 press release, amendment proponent Representative Scott Suder disputed claims that the marriage amendment would prohibit extending benefits to same-sex couples. Suder's press release stated that "the proposal does NOT prohibit the state, local governments, or private businesses from extending health insurance benefits and other privileges to same sex couples."

¶ 54. Later in 2006, Representative Gundrum, in a Milwaukee Journal Sentinel article, was quoted as saying the amendment "would allow the Legislature at some point to create a civil union that includes a limited number of benefits, as long as it wasn't 'substantially similar' to what's granted to a married couple." Gundrum added that the amendment's second sentence was designed to " 'prevent activist judges from doing what they did in Vermont—dictating that there be . . . marriage under a different name . . . . That's all it's intended to do.' "[15]

---

[15] The amicus brief filed by the ACLU and five lesbian couples argues that amendment proponents declared that the amendment would not alter existing domestic partnership benefits, such as those offered by the City of Milwaukee. These amici point to an August 6, 2006 Milwaukee Journal Sentinel article in which Representative Gundrum stated that "not one privilege or benefit that now exists for heterosexual or homosexual couples will be prohibited by this amendment." The amici explain that, at the time Representative Gundrum made that statement, the City of Milwaukee offered domestic partner benefits for registered same-sex couples. Milwaukee required same-sex couples to file a declaration that they:

¶ 55.   On November 2, 2006, just five days prior to the public vote on the marriage amendment, Senator Fitzgerald asserted in a press release:

> The non-partisan Legislative Council has written that the proposed amendment does not ban civil unions, only a Vermont-style system that is simply marriage by another name. If the amendment is approved by the voters, which I expect it will be, the legislature will still be free to pass legislation creating civil unions if it so desires.

¶ 56.   Our focus so far has been on the statements of proponent legislators and a legislative agency they relied on to support their expressed views of the amendment's effects. The legislators' statements plainly informed voters that domestic partnerships would be permitted and that some subset of the rights

- "Are in a domestic relationship of mutual support, caring and commitment, and intend to remain in that relationship."
- "Are 18 years of age or older and competent to enter into a contract."
- "Are not married."
- "Are not related by kinship to a degree that would bar marriage in this state."
- "Are the same sex."
- "Reside together in the city of Milwaukee."
- "Have not been in a registered domestic partnership with another individual during the 12 months immediately prior to the application date unless that domestic partnership was terminated by death or marriage."

MILWAUKEE, WIS., CODE OF ORDINANCES, Domestic Partnership, ch. 111, § 111–3 (1999). These amici argue that proponents, like Representative Gundrum, were assuring the voters that laws like the City of Milwaukee's "domestic relationship" law, which mirrors the state domestic partnership law, would survive passage of the marriage amendment.

787

and obligations that go with marriage could similarly be accorded to such partnerships.

¶ 57. We now turn our attention to public statements made by proponents who were not legislators. *See Dairyland*, 295 Wis. 2d 1, ¶¶ 37–38 (looking to the "ratification campaign that surrounded the voters' passage of the . . . Amendment," including "[p]ublic statements and news accounts" leading up to the vote).

¶ 58. Julaine Appling, one of the plaintiffs in this case, was quoted in a local Madison paper as explaining that the goal of the amendment is to stop "Vermont-style" civil unions that confer virtually all legal rights of marriage on gay couples. In a subsequent opinion piece, published in a UW-Madison student newspaper, Appling wrote:

> The first phrase [of the marriage amendment] protects the word "marriage," while the second protects marriage from being undermined by "look-alike marriages," or marriage by another name, such as Vermont-style civil unions. Without the second phrase, the first one is meaningless and leaves the institution unprotected.
>
> *Contrary to the message being consistently given by opponents of the amendment, the second phrase does not "ban civil unions."* It does appropriately prohibit civil unions that are marriage by another name. However, *it does not preclude the state legislature from considering some legal construct – call it what you will – that would give select benefits to co-habiting adults.*

(Emphasis added.)

¶ 59. In a question-and-answer session on its website, the Wisconsin Coalition for Traditional Marriage explained that the purpose of the amendment was to prevent replicas of marriage by another name:

> The purpose is to protect the people of Wisconsin from having a court impose "look-alike" or "Vermont-

788

style" homosexual "marriage," which Vermont legalized as "civil unions." These civil unions are simply marriage by another name. They are a legally exact replica of marriage, but without the title. The second part to Wisconsin's marriage amendment protects citizens from having a court impose, against their will, this type of arrangement here, regardless of the name given to it.

Similarly, the Family Research Institute of Wisconsin published an article in 2006 stating that the amendment would not "prevent the state legislature from taking up a bill that gives a limited number of benefits to people in sexual relationships outside of marriage," but that Vermont-style civil unions "would not be valid [in Wisconsin] since Vermont's civil unions are exactly analogous to marriage."

¶ 60. In a televised debate approximately one month before the vote in 2006, proponents continued to give assurances that the marriage amendment would allow room for domestic partnerships. During this debate, amendment proponent Richard Esenberg spoke clearly on the issue at hand:

> Think of marriage as a bundle of sticks. Each stick is a different right or incident of marriage. The second sentence only prohibits creation of a legal status which would convey virtually all of those sticks.

This explanation, with its focus on whether a non-marital relationship would "convey virtually all" of the rights and incidents of marriage (the "sticks") contrasts sharply with Appling's current position that these "sticks" do not matter. Indeed, notably absent from the proponent statements prior to the vote is the interpretation Appling advances on appeal—that the marriage amendment addresses only eligibility and formation requirements.

¶ 61. Before concluding our historical-context-of-passage discussion, we must address Appling's "conjugal-model" argument because it is seemingly premised, at least in part, on the notion that this topic was a relevant part of the public debate.

¶ 62. Appling spends considerable time arguing that persons who voted for the marriage amendment rejected the "close relationship model" of marriage and, instead, intended that the amendment preserve the "conjugal model" of marriage. Appling states that "Wisconsinites voted to preserve the 'conjugal model' of marriage, to the exclusion of all other models of adult relationships." Appling explains that the "conjugal model" is based on the premise that marriage is for sexual procreation and is "child-focused." Appling points to proponent statements such as the following: "The institution of marriage . . . has been built around this idea that a man and a woman come together and have this procreative capacity." In contrast, according to Appling, under the "close relationship model," marriage is best understood as a private relationship between two people with the primary purpose of satisfying the adults who enter into it.

¶ 63. We agree with the circuit court's observation that "there is no evidence that voters ratified the Marriage Amendment with the intent to further a conjugal model of marriage." Quite obviously, nothing about the amendment alters the fact that opposite-sex couples who are not able to procreate, or who choose not to, routinely enter into marriage. But more to the point, even assuming that the conjugal-model argument has some bearing on the effort to persuade voters to restrict *marriage* to opposite-sex couples, it does not speak to the issue at hand. That is, it does not shed light on which non-marital relationships are permissible under the amendment.

¶ 64.   In sum, our review of the historical context of passage persuades us that informed voters would have understood that marriage amendment proponents were saying that the marriage amendment would not ban legally recognized domestic partnerships conferring a limited subset of the rights and obligations of marriage. Because we have concluded that the most reasonable assumption is that the view of the proponents prevailed with those who voted in favor of the amendment, we also conclude that this source of voter intent favors a definition of "legal status" that includes rights and obligations.[16]

## C.  *Third Source:  Earliest Interpretations By Legislature*

¶ 65.   There is only one "early" legislative interpretation of the marriage amendment at issue here, the

---

[16] It is clear that the statements of proponents carry with them the assumption that a viable domestic partnership law could be enacted. If we were to further assume that such proponents had in mind that "substantially similar" was to be measured solely with reference to eligibility and formation requirements, the question arises as to *what* eligibility and formation requirements Appling would find constitutionally acceptable. That is, if both the proponents' statements then and Appling's arguments now can be harmonized, it must be possible to formulate domestic partnership eligibility and formation requirements for legally recognized same-sex relationships that are not "substantially similar" to those of marriage and then apply to these same-sex relationships all or most of the rights and obligations of marriage. Yet Appling does not explain how, under her interpretation of the marriage amendment, the legislature could formulate both meaningful and substantially different eligibility and formation requirements for same-sex domestic partnerships. We raise this question to highlight the fact that Appling's argument might have been more persuasive if she had, employing her own interpretation of the marriage amendment, provided an example of domestic partnership eligibility and formation criteria that would be both meaningful and constitutionally sound.

domestic partnership law itself. And, there is no doubt that in enacting the domestic partnership law the legislature was expressing its belief that the "legal status" it was creating was not "substantially similar" to marital "legal status." The first section of the chapter creating domestic partnerships states: "The legislature . . . finds that the legal status of domestic partnership as established in this chapter is not substantially similar to that of marriage." WIS. STAT. § 770.001.

¶ 66. Thus, if we consider this early legislative interpretation, it weighs in favor of finding the domestic partnership law constitutional. However, for the reasons that follow, we do not rely on it.

¶ 67. Appling contends that we should not consider the domestic partnership law for three reasons:

- The domestic partnership law was not "contemporaneously" enacted with the marriage amendment.
- The domestic partnership law is the law being challenged.
- The domestic partnership law should be accorded little weight because of the change in make-up of the legislature between the time the proponents of the amendment introduced the bills that sent the marriage amendment to the voters and the time the legislature enacted the domestic partnership law.

We structure our discussion around these three reasons.

¶ 68. As to Appling's not-contemporaneously-enacted argument, Appling relies on a paragraph in a concurring/dissenting opinion in *Dairyland*. Her reliance is misplaced. In the portion of *Dairyland* cited by Appling, Justice Prosser states:

Courts may scrutinize the earliest interpretations of the provision by the legislature as manifested in the

> first laws passed following adoption of the provision.
> Legislation that implements a constitutional provision
> is thought to be a fair gauge of contemporary interpre-
> tation and is entitled to great deference.

*Dairyland*, 295 Wis. 2d 1, ¶ 117 (Prosser, J., concurring in part, dissenting in part) (citations omitted). The first sentence above simply repeats the rule that we look to the "earliest interpretation." The second sentence, read in context, is nothing more than an observation that, when the earliest interpretation is a "contemporary interpretation," that interpretation is entitled to great deference. Nowhere does Justice Prosser suggest, as Appling does, that an "earliest interpretation" must be contemporaneous or "contemporary" to have value. Indeed, neither the majority nor Justice Prosser puts any particular emphasis on implementing legislation, as opposed to other non-implementing legislative action. Thus, we agree with Fair Wisconsin that Appling provides no authority for her suggestion that only contemporaneous legislative action is relevant.

¶ 69.   As to Appling's argument that we should not look at legislative action if that action is the adoption of the law being challenged, she provides neither legal nor logical support. Why, for example, would implementing legislation be persuasive except when that legislation is the law being challenged? Appling supplies no answer, and we perceive none. We discuss the matter no further.

¶ 70.   Appling's last argument rests on the changed make-up of the legislature. Appling asserts, and Fair Wisconsin does not dispute, that between the time the marriage amendment bills were passed in the 2003 and 2005 sessions and the time the domestic partnership law was enacted in 2009, the legislature changed from being controlled by the political party that championed the marriage amendment to being

controlled by the political party that generally opposed the amendment. We understand Appling to be arguing that legislators who opposed, or would have opposed, the marriage amendment are more likely to have passed a domestic partnership law that violates the amendment by creating a legal status too much like marriage. Fair Wisconsin does not respond to Appling's changed-legislature argument, at least not directly.

¶ 71. Appling's point is an interesting one, but we decline to adopt it. It may be true that individual legislators who did or would have voted against the 2003 and 2005 marriage amendment legislation, and who also voted in favor of the domestic partnership law, might seemingly be inclined to legislate in a way that does the most to limit what they perceive to be an unwise amendment. And, in doing so, such legislators might, at least inadvertently, cross the constitutional line, so to speak. On the other hand, Appling's proposal may conflict with the deference we are required to accord the legislature.[17]

[17] Without referencing Appling's changed-legislature argument, Fair Wisconsin may mean to address this topic when it asks us to look at evidence suggesting that, in enacting the domestic partnership law, the legislature consulted with legal experts and took care to pass a constitutional law. We are uncertain, however, whether this evidence refutes Appling's changed-legislature argument when the context is the "earliest interpretation" consideration in the three-source test we apply today. It may be that the evidence Fair Wisconsin points to adds nothing to the more general proposition that, whenever we review legislation, we make assumptions that favor the legislature. *See State ex rel. Carnation Milk Prods. Co. v. Emery,* 178 Wis. 147, 160, 189 N.W. 564 (1922) ("If there is any reasonable basis upon which the legislation may constitutionally rest, the court must assume that the legislature had such fact in mind and passed the act pursuant thereto.").

¶ 72. We choose not to resolve this issue for two reasons. First, we lack well-developed adversarial briefing on the topic. Second, the resolution of this issue would not affect the outcome here. At best, Appling presents an argument as to why we should ignore the domestic partnership law as an indicator of voter intent. As should be clear by now, even if we ignore the legislature's "earliest interpretation" of the marriage amendment, namely the domestic partnership law, we would agree with the circuit court and Fair Wisconsin that the "legal status" of a domestic partnership is not "substantially similar" to the "legal status" of marriage.

¶ 73. We realize that the net result—of our decision to leave for another day the resolution of Appling's changed-legislature argument—is the same as if we were to agree with Appling's argument. That is, the result is that we do not give weight to the domestic partnership law as an indication of voter intent. But we reach that result by a different route, and this difference matters. We do not bind future circuit or appellate courts that may be called on to address the topic.

¶ 74. Accordingly, unlike the circuit court, we do not look to the domestic partnership law for guidance on the meaning of the marriage amendment.

*D. Conclusion Regarding The Meaning of "Legal Status"*

¶ 75. Both plain meaning and the historical context of passage favor interpreting "legal status" as referring to eligibility, formation, and termination requirements and attending rights and obligations. In reaching the conclusion that "legal status" has this meaning, we need not and do not rely on the legislature's earliest interpretation of the marriage amendment, the domestic partnership law itself.

## II.  Application Of "Legal Status" And "Substantially Similar" To The Domestic Partnership Law

■

¶ 76.   Although Appling does not argue that the "legal status" of marriage and the "legal status" of domestic partnerships are "substantially similar" if the comparison includes termination requirements and rights and obligations, this issue is too important to decide based on Appling's implicit concession. Accordingly, we will explain why we agree with Fair Wisconsin and the circuit court that Wisconsin domestic partnerships are not substantially similar to marriage.

### A.  Eligibility

¶ 77.   The parties dispute whether the eligibility requirements for marriage and domestic partnerships are substantially similar. Appling contends that the two are substantially similar because all of the key requirements are the same or functionally similar. According to Appling, they have the following in common:

- There is a limit of two persons.

- The sex of the parties is specified.

- The parties must be competent to consent.

- The parties must be over a specified age.

- The parties may not be too closely related by blood —generally speaking, not closer than second cousins.

- The parties cannot be married to someone else.

796

*See* WIS. STAT. §§ 765.001(2), 765.01, 765.02(1), 765.03, 765.03(1), 770.05, 770.05(1), 770.05(2), 770.05(4), 770.05(5).

¶ 78. As to eligibility requirements, we agree with Appling's criticism of the circuit court's conclusion that one significant difference is that marriage involves opposite-sex couples, whereas domestic partnerships involve same-sex couples. We agree with Appling that, in this respect, they are substantially similar because they both specify the permissible gender combination. Moreover, because the plain purpose of the marriage amendment is to preserve the institution of opposite-sex marriage, it makes no sense to say that one difference weighing in favor of the constitutionality of domestic partnerships is that they involve same-sex relationships.

¶ 79. On the other hand, we disagree with Appling's analysis of the domestic partnership prerequisite that couples already "share a common residence," *see* WIS. STAT. § 770.05(3), something that is not a marital prerequisite. Appling contends that this difference is trivial because "spousal residence sharing is . . . universal" and this "requirement actually mirrors Wisconsin marriage law, as community property principles establish presumptively shared residences and property as a matter of law." Appling has this wrong.

¶ 80. Appling's comparison is flawed because she is comparing a pre-domestic partnership requirement with *post*-marriage practice. As to both types of relationships post-formation, there is no common residence requirement, but it is sensible to assume that both types of couples overwhelmingly reside together. And, contrary to Appling's suggestion, the domestic partnership common residence requirement has nothing to do with property rights.

797

¶ 81. As to the pre-formation comparison that does matter, there is no requirement that opposite-sex couples must live together before getting married. Indeed, it is hard to imagine any legislature ever imposing such a prerequisite on marriage. In contrast, same-sex couples must live together first, apparently, to provide evidence that their relationships are the type of same-sex relationship the state is willing to recognize. This is not a trivial difference, and we add it to the mix.

¶ 82. As to other differences the parties discuss, such as differences in the consanguinity and waiting requirements, we do not resolve their disputes. Even assuming for purposes of this opinion that the other differences are insignificant, as Appling contends, her constitutional challenge fails.

## B. Formation

¶ 83. The parties dispute whether the formation requirements for marriage and domestic partnerships are substantially similar. Appling argues that the formation requirements for domestic partnerships mimic those for marriage. She contends that prospective parties to both relationships must submit a sworn application to the county clerk, present identification, pay a fee, and then wait for receipt of declaration. And, Appling maintains, the requirement that domestic partners must sign the declaration before a notary is "ceremonial" and, therefore, similar to the mutual declarations marrying couples must make before a state-authorized officiant and two competent witnesses.

¶ 84. Fair Wisconsin points to differences such as the fact that, unlike domestic partnership formation, in the formation of marriage certain individuals have the opportunity to object, Wis. Stat. § 765.11, couples must

complete a marriage license worksheet, Wis. Stat. § 765.13, and couples may pay a fee to accelerate their application, Wis. Stat. § 765.08(2). With the exception discussed below, we choose not to resolve whether these and other differences in formation are significant, either individually or in combination. The reason is that, as with several disputes over eligibility requirements, even if we assume in Appling's favor that these differences are insignificant, her constitutional challenge would still fall short.

¶ 85.　We agree with Fair Wisconsin that there is a significant difference between signing a declaration before a notary and being required to make an oral declaration to each other before a state-authorized officiant and two competent witnesses. *See* Wis. Stat. §§ 765.16, 765.17. The latter is ceremonial in nature; the former is purely a matter of assuring that the signatures are valid. As the circuit court explained, it is true that same-sex couples might choose to have a ceremony of their own making that is similar to a marriage ceremony, but such a ceremony, unlike a marriage ceremony, is irrelevant in the eyes of the law.

¶ 86.　Thus, as with the reside-together eligibility requirement, we conclude that the lack-of-a-ceremony requirement is a significant difference, and we add it to our list of differences that are significant for purposes of determining whether the "legal status" of marriage and the "legal status" of domestic partnerships are "substantially similar."

## C.　Rights And Obligations

¶ 87.　As the circuit court explained, it would "take pages" to list the rights and obligations that go with marriages but not domestic partnerships. The circuit

court provided a subset listing of 33 items. It is not necessary to list that many here to demonstrate that, regardless of the precise meaning of the term "substantially similar," the rights and obligations of marriage are not substantially similar to the rights and obligations of domestic partnerships.

¶ 88.   The following are significant rights and obligations that go with marriages, but not domestic partnerships:

- There is a presumption that all property of married couples is marital property. WIS. STAT. § 766.31(3).

- A spouse is eligible to obtain a court order addressing the property and obligations of his or her spouse including, if appropriate, a directive that documents reflect ownership as marital property. WIS. STAT. § 766.70(2) and (3).

- The home of a spouse, currently residing in a nursing home, is protected from a lien to pay for nursing home care if the other spouse is living in the home. WIS. STAT. § 49.496(2)(b).

- Insurers offering group health benefit plans must offer enrollment to the spouse of a newly married covered spouse. WIS. STAT. § 632.746(7).

- Former spouses may elect to continue to receive health insurance previously received through their spouses. WIS. STAT. § 632.897(2)(b) and (9)(b).

- Unremarried spouses of deceased veterans are eligible for loans under the state veterans housing loan program. WIS. STAT. § 45.33.

- A spouse is eligible for maintenance from his or her former spouse and the right to file an action to compel such financial support. WIS. STAT. §§ 767.56, 767.57.

- Spouses may adopt children jointly. WIS. STAT. § 48.82(1).

- The surviving spouse of a decedent takes priority over other relatives with respect to the final disposition of the body of the deceased spouse. WIS. STAT. § 154.30(2).

As previously explained, Appling does not argue that these and other differences in the rights and obligations of marriage and domestic partnerships are not, taken collectively, "substantial" within the meaning of the marriage amendment. We conclude that she could not reasonably do so.[18]

### D.   Termination

¶ 89.   The termination procedures for domestic partnerships and marriages are substantially different. It could hardly be simpler to terminate a domestic partnership. Either party may unilaterally terminate the relationship by filing a notice of termination with the county clerk, providing notice to his or her partner, and paying a termination fee. WIS. STAT. § 770.12(1). And, in very un-marriage-like fashion, a domestic partnership automatically terminates if one of the persons gets married. WIS. STAT. § 770.12(4)(b).

¶ 90.   Terminating a marriage is far more complex, even when children are not involved. A marriage

---

[18] In fact, Appling suggests in her appellate brief that differences in rights relating to marital property law *alone* might be a substantial difference. Appling does this clearly, albeit indirectly, when she discusses cross-jurisdictional recognition of marriage. In that context, Appling contends that, if rights and obligations are included in the concept of "legal status," then Wisconsin might not recognize marriages from other states that do not confer similar "principles of community property" as does Wisconsin. Under Appling's logic, this sole difference might be significant enough to render such marriages from other jurisdictions *not* "substantially similar."

must be terminated through a divorce proceeding involving the courts. A spouse wishing to divorce must serve a petition for divorce on the other spouse. WIS. STAT. § 767.215. After service, there is a 120–day waiting period. WIS. STAT. § 767.335(1). A court-ordered or approved division of debt and property must then be made between the two parties, WIS. STAT. § 767.61, as well as a determination regarding whether there should be maintenance, WIS. STAT. §§ 767.56, 767.57. And, there must be a judgment of divorce. WIS. STAT. § 767.35(1).

¶ 91.   Since Appling does not discuss termination, she obviously does not discuss whether the differences in this respect are significant. We conclude she could not reasonably argue that they are not significantly different.

### E.   Conclusion Regarding Whether the "Legal Statuses" Are "Substantially Similar"

¶ 92.   The differences we have identified above, viewed collectively, show that the "legal status" of a domestic partnership is not "substantially similar" to the "legal status" of marriage. Moreover, even if we ignored the two differences relating to eligibility and formation that we discuss above, we would still conclude that the legal statuses are not "substantially similar."

¶ 93.   On a final note, we address Appling's argument that proof of substantial similarity is supplied by how different domestic partnerships and marriage are from all other legally recognized relationships. Appling contends that domestic partnerships stand alone as an alternative to marriage. We agree with Appling that marriage and domestic partnerships are very different from other legal relationships, but this does not help Appling. The question is not whether, relatively speak-

ing, these relationships are substantially different than other legally recognized relationships. The question is whether they are "substantially similar" to each other. They are not.

## Conclusion

¶ 94.   For the reasons above, we affirm the circuit court's conclusion that Wisconsin's domestic partnership law does not violate the marriage amendment.

*By the Court.*—Order affirmed.