# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2011AP1572 |
| COMPLETE TITLE: | Julaine K. Appling, Jo Egelhoff, Jaren E. Hiller, Richard Kessenich and Edmund L. Webster, |
| |         Plaintiffs-Appellants-Petitioners, |
| |     v. |
| | Scott Walker, Kitty Rhoades and Oskar Anderson, |
| |         Defendants-Respondents, |
| | Fair Wisconsin, Inc., Glenn Carlson, Michael Childers, Crystal Hyslop, Janice Czyscon, Kathy Flores, Ann Kendzierski, David Kopitzke, Paul Klawiter, Chad Wege and Andrew Wege, |
| |         Intervening Defendants-Respondents. |

REVIEW OF A DECISION OF THE COURT OF APPEALS
Reported at 345 Wis. 2d 762, 826 N.W.2d 666
(Ct. App. 2013 – Published)
PDC No.: 2013 WI App 3

| | |
|---|---|
| OPINION FILED: | July 31, 2014 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | October 23, 2013 |

| | | |
|---|---|---|
| SOURCE OF APPEAL: | | |
| | COURT: | Circuit |
| | COUNTY: | Dane |
| | JUDGE: | Daniel R. Moeser |

| | | |
|---|---|---|
| JUSTICES: | | |
| | CONCURRED: | ABRAHAMSON, C.J., concurs. (Opinion filed.) |
| | | ROGGENSACK, J., concurs. (Opinion filed.) |
| | DISSENTED: | |
| | NOT PARTICIPATING: | |

ATTORNEYS:

For the plaintiffs-appellants-petitioners, there were briefs by *Michael D. Dean* and *First Freedoms Foundation Inc.*, Brookfield; *Richard Esenberg*, Mequon; *David Austin Robert Nimocks*, *James A. Campbell*, and *Alliance Defending Freedom*,

Washington D.C., and oral argument by *David Austin Robert Nimocks*.

For the intervening defendants-respondents, the cause was argued by *Christopher R. Clark* of *Lambda Legal Defense and Education Fund, Inc.*, Chicago; with whom on the brief was *Brian Butler*, *Barbara Neider*, and *Stafford Rosenbaum LLP*, Madison.

An amicus curiae brief was filed by *Dyann L. Hafner*, assistant corporation counsel, on behalf of Dane County.

An amicus curiae brief was filed by *Donald K. Schott*, *Joseph T. Hanes*, and *Quarles & Brady LLP*, Madison; *Sarah L. Fowles* and *Quarles & Brady LLP*, Milwaukee; and *Laurence J. Dupuis* and *ACLU of Wisconsin Foundation, Inc.*, Milwaukee; and *John A. Knight* and *American Civil Liberties Union Foundation*, Chicago; on behalf of LGBT Chamber of Commerce, Katharine Heyning, Judith Trampf, Wendy Woodruff, Mary Woodruff, Jayne Dunnum, Robin Timm, Virgina Wolf, and Carol Schumacher.

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No. 2011AP1572
(L.C. No. 2010CV4434)

STATE OF WISCONSIN       :    IN SUPREME COURT

**Julaine K. Appling, Jo Egelhoff, Jaren E. Hiller, Richard Kessenich and Edmund L. Webster,**

      **Plaintiffs-Appellants-Petitioners**

  **v.**

**Scott Walker, Kitty Rhoades and Oskar Anderson,**

      **Defendants-Respondents,**

**Fair Wisconsin, Inc., Glenn Carlson, Michael Childers, Crystal Hyslop, Janice Czyscon, Kathy Flores, Ann Kendzierski, David Kopitzke, Paul Klawiter, Chad Wege and Andrew Wege,**

      **Intervening Defendants-Respondents.**

**FILED**

**JUL 31, 2014**

Diane M. Fremgen
Clerk of Supreme Court

REVIEW of a decision of the Court of Appeals. *Affirmed.*

¶1  N. PATRICK CROOKS, J.  Wisconsin voters amended the state constitution in 2006, adding two sentences: "Only a marriage between one man and one woman shall be valid or recognized as a marriage in this state. A legal status identical or substantially similar to that of marriage for unmarried individuals shall not be valid or recognized in this

state."[1]   In this case we are asked to determine whether Wis. Stat. Chapter 770, by which the legislature created the legal status of domestic partnership for same-sex couples,[2] violates that constitutional provision.[3]

---

[1] Art. XIII, Sec. 13, Wisconsin Constitution.

[2] Wis. Stat. § 770.01 defines domestic partner and domestic partnership as follows:

> (1) "Domestic partner" means an individual who has signed and filed a declaration of domestic partnership in the office of the register of deeds of the county in which he or she resides.

> (2) "Domestic partnership" means the legal relationship that is formed between 2 individuals under this chapter.

To form a domestic partnership, individuals must be members of the same sex, must not be nearer of kin to each other than second cousins, must be at least 18 years old and capable of consent, must share a common residence, and must not be married to or in a domestic partnership with another person. Wis. Stat. § 770.05.

[3] This case contains no challenge to Art. XIII, Sec. 13 itself. As the court of appeals stated, "This case is not about whether the Wisconsin or United States Constitutions require, on equal protection or other grounds, that same-sex couples have the right to a legally recognized relationship that is identical or substantially similar to marriage. To the contrary, for the domestic partnership law to pass muster here, the 'legal status' created by that law may not be 'substantially similar' to the 'legal status' of marriage." Appling v. Doyle, 2013 WI App 3, ¶5, 345 Wis. 2d 762, 826 N.W.2d 666.

¶2  The question is whether Plaintiffs[4] have proved beyond a reasonable doubt that the same-sex domestic partnership created by Chapter 770 violates Article XIII, Section 13 of the Wisconsin Constitution. Under our precedent, intent is critical to determining what the Amendment means[5] and consequently to determining whether the statute, which is accorded a presumption of constitutionality, withstands the Plaintiffs' challenge.

¶3  For the reasons stated herein, we affirm the court of appeals' holding that Chapter 770 is constitutional based on the presumption of constitutionality, the Plaintiffs' failure to meet the burden of proof, and the evidence we have reviewed in accord with the Dairyland decision, which establishes the framework we use to interpret constitutional provisions. Dairyland Greyhound Park, Inc. v. Doyle, 2006 WI 107, 295 Wis. 2d 1, 719 N.W.2d 408.

---

[4] Julaine Appling and other named plaintiffs (collectively, Plaintiffs) were the president and members of the board of directors, respectively, of Wisconsin Family Action, a not-for-profit organization that advocated publicly for the approval of the Marriage Amendment. At the time of the ratification process, Appling also held other positions with Family Research Institute of Wisconsin, the Vote Yes for Marriage referendum campaign, and the Wisconsin Coalition for Traditional Marriage.

[5] State ex rel. Bare v. Schinz, 194 Wis. 397, 404, 216 N.W. 509 (1927) ("The constitution means what its framers and the people approving of it have intended it to mean . . . .")

3

¶4 Intervening Defendants[6] argue that the Amendment does not bar domestic partnerships because they are not "substantially similar" to marriage, and they point to many differences, including a long list of rights of married people that are not conferred on domestic partners. It is Plaintiffs' position that what makes the domestic partnership a legal status substantially similar to that of marriage is that the similarities it shares with marriage are actually "the constituent elements that make the legally recognized marital relationship what it is——the component parts of the marital relationship . . . ." Those elements identified by Plaintiffs in their briefs as "constituent elements" of marriage are that it is 1) between two persons 2) who are over a certain age, 3) who are competent to consent, 4) who are in an exclusive relationship, 5) who are of specified sexes, and 6) who are not

---

[6] Fair Wisconsin, Inc., a non-profit organization that advocates for the civil rights of lesbian, gay, bisexual and transgendered people, and ten individuals (collectively, Intervening Defendants) were granted leave to intervene to defend the constitutionality of the domestic partnership statute after the Defendants (the governor, secretary of the Wisconsin Department of Health Services, and the Wisconsin Registrar of Vital Statistics) filed a motion to withdraw from the case on the grounds that their position had changed with the new administration and was now consistent with that of the Plaintiffs.

As the court of appeals noted, "The Attorney General has declined to defend the domestic partnership law and . . . the appointed counsel for the defendants likewise declined to defend the law. Accordingly, the task of defending the law fell solely to the intervening defendants-respondents . . . ." Appling v. Doyle, 345 Wis. 2d 762, ¶3 n.2.

closely related.[7]  Plaintiffs focus on these characteristics——not the rights, duties and benefits that are associated with each status——as the "essential and material elements on which the marriage relation rests"[8] and the substantial similarity that

---

[7]  See Wis. Stat. §§ 765.02, 765.03 (requirements for persons entering into marriage) and Wis. Stat. § 770.05 (requirements for persons entering into domestic partnerships).

[8] Plaintiffs have not identified any authority for the proposition that the elements they identify are the defining constituent elements of marriage for purposes of our "substantially similar" analysis.  The apparent source of the phrase "constituent elements" is a citation by Plaintiffs to a similar phrase——"essential and material elements on which the marriage relation rests"——that appears in Varney v. Varney, an 1881 case.

There, a husband sought to void a marriage on the basis of the alleged "fraudulent and false representations of the respondent as to her previous character for chastity"; the court rejected his claim, holding that "no misconception as to the character, fortune, health, or temper, however brought about, will support an allegation of fraud on which a dissolution of the marriage contract, when once executed, can be obtained in a court of justice. These are accidental qualities, which do not constitute the essential and material elements on which the marriage relation rests. The law, in the exercise of a wise and sound policy, seeks to render the contract of marriage, when once executed, as far as possible indissoluble." Varney v. Varney, 52 Wis. 120, 123, 8 N.W. 739 (1881) (emphasis added).

Because it does not attempt to say what the essential and material elements are, Varney does not support the proposition that the six elements Plaintiffs identify in their brief are the essential elements of marriage.  At oral argument, Plaintiffs appeared to narrow their focus to two characteristics that made a status "substantially similar" to marriage: the presence of consanguinity prohibitions and gender specificity requirements. There was likewise no legal authority cited for the proposition that those two characteristics constitute the essence of marriage and that any legal status where they are present is substantially similar to marriage.  See ¶54 infra.

renders the domestic partnership law unconstitutional.  They acknowledge that the legislature has the power to create a domestic partnership status and accord it as many rights as it wishes.  They say that what the legislature cannot do is define eligibility based on marriage-like intimate relationships, and that it could avoid violating the Amendment by making such a status available to cohabiting adults, such as siblings, to remove the substantial similarity to marriage.

¶5   In short, they contend that it is the "existence of an exclusive, intimate relationship——clearly implicit in Chapter 770——that creates the substantially similar status" and that Chapter 770 created "the very thing that the Amendment was designed to prohibit."

¶6   It is well established that challengers to a statute face a very difficult task.

> A statute enjoys a presumption of constitutionality. To overcome that presumption, a party challenging a statute's constitutionality bears a heavy burden. It is insufficient for the party challenging the statute to merely establish either that the statute's constitutionality is doubtful or that the statute is probably unconstitutional. Instead, the party challenging a statute's constitutionality must "prove that the statute is unconstitutional beyond a reasonable doubt."

State v. Smith, 2010 WI 16, ¶8, 323 Wis. 2d 377, 780 N.W.2d 90 (citations omitted).  "Furthermore, 'every presumption must be indulged to sustain the law if at all possible and, wherever doubt exists as to a legislative enactment's constitutionality,

it must be resolved in favor of constitutionality.'"  Georgina
G. v. Terry M., 184 Wis. 2d 492, 515, 516 N.W.2d 678 (1994).

¶7  Such a framework for analysis has doomed many
challenges, and it dooms this one as well.  Like the circuit
court and the court of appeals, we conclude that the Plaintiffs
have not met their burden of proving beyond a reasonable doubt
that the domestic partnership law is unconstitutional.  Our
conclusion is compelled by the presumption of constitutionality,
the Plaintiffs' failure to meet the burden of proof, and the
evidence we have reviewed in accord with the test set forth in
the Dairyland decision.[9]  "The constitution means what its
framers and the people approving of it have intended it to
mean . . . ."[10]  To determine what the framers and the voters
intended a constitutional amendment to mean, based on our
precedent we are to consider what is reflected in the plain
language of the statute, the constitutional debates and
practices of the time as exemplified during the ratification
campaign that surrounded the voters' passage of the Amendment,
as well as, to the extent probative, the first legislation
passed following the Amendment's passage.[11]

---

[9] "[This Court] examine[s] three primary sources in determining the  meaning of a constitutional provision: the plain meaning, the constitutional debates and practices of the time, and the earliest interpretations of the provision by the legislature, as manifested through the first legislative action following adoption." Dairyland Greyhound Park, Inc. v. Doyle, 2006 WI 107, ¶19, 295 Wis. 2d 1, 719 N.W.2d 408.

[10] Bare, 194 Wis. at 404.

[11] Dairyland Greyhound Park, Inc., 295 Wis. 2d 1, ¶19.

¶8 The plain language of the Amendment prohibits only a status "identical or substantially similar to" marriage, and by implication it does not prohibit what is not identical or substantially similar thereto. There are important statutory distinctions in the way the state treats marriage and domestic partnerships and important differences in the lists of benefits and obligations that inhere in the two types of relationships.[12] In light of the totality of those differences, Plaintiffs have not overcome the presumption that Chapter 770 is constitutional.

¶9 Our conclusion is supported by evidence from the drafting and ratification process -- evidence in the drafting files[13] that the framers of the Amendment intended specifically to allow legislation that provided a set of rights and benefits to same-sex couples. We are supported in our conclusion by evidence that voters were repeatedly told by Amendment

---

[12] See infra, ¶¶31-32.

[13] For example, the drafting files contain a memorandum from Rep. Mark D. Gundrum seeking co-sponsors in the Assembly, which says that the proposal "would 'prevent same-sex marriages from being legalized in this state'"; it goes on to state that the proposal "does not prohibit the state . . . from setting up [its] own legal construct to provide particular privileges or benefits, such as health insurance benefits, pension benefits, joint tax return filing, hospital visitation, etc. as those bodies are able and deem appropriate."

The drafting file contains a press release from Rep. Scott Suder, dated March 1, 2006, which states, "Despite what some gay rights groups are claiming, Suder said the proposal does NOT prohibit the state, local governments, or private businesses from extending health insurance benefits and other privileges to same sex couples."

proponents that the Amendment simply would not preclude a mechanism for legislative grants of certain rights to same-sex couples.[14] We see no evidence that voters who approved the Amendment saw it as permitting those rights to be granted only in the kind of scheme Plaintiffs now suggest——that is, in cohabiting domestic relationships that bear no resemblance at all to marriage, with same-sex couples only as incidental beneficiaries.[15] Of course the Amendment's opponents put out a different message to voters, but as the court of appeals noted, it makes sense to credit the notion, when the proponents prevail in a referendum, that theirs was the message that resonated with the majority of voters.[16] Finally, our conclusion draws additional support, although limited, from the legislature's

---

[14] E.g., an August 2006 publication from the Family Research Institute of Wisconsin, "Questions and Answers About Wisconsin's Marriage Protection Law," stated, "The second sentence [of the Amendment] doesn't even prevent the state legislature from taking up a bill that gives a limited number of benefits to people in sexual relationships outside of marriage, should the legislature want to do so." (Emphasis added.)

[15] That argument is untenable because leaving consideration of the associated rights and benefits out of the analysis would mean, as the court of appeals noted, that the legislature could constitutionally create a set of eligibility requirements that did not resemble marriage "and then confer on that status all the rights and obligations of marriage." Appling, 345 Wis. 2d 762, ¶31. As the court of appeals points out, "[s]uch a scenario, permissible under [Plaintiffs'] theory, is the very definition of marriage by another name," and that is without question what the Amendment prohibits. Id.

[16] Appling, 345 Wis. 2d 762, ¶¶47-48 ("[T]he more reasonable and obvious conclusion is that voters who ended up favoring the amendment were, generally speaking, persuaded by statements of the proponents, including proponent assurances of the amendment's effect on domestic partnerships.").

careful adoption of the first legislative act following the Marriage Amendment, adoption of Chapter 770 itself.

BACKGROUND

¶10 The ratification of the Marriage Amendment and the passage of the domestic partnership law occurred against a backdrop of significant social and legal shifts across the country concerning the status of same-sex couples. What happened in two states in particular is relevant because they were frequently cited by Amendment proponents in the course of the ratification process. A 2003 Massachusetts Supreme Judicial Court decision establishing the right of same-sex couples to marry in Massachusetts is widely seen as the catalyst for the subsequent developments.[17] Following a similar court ruling by the Vermont Supreme Court, Vermont's legislature passed a law that created what became known as "Vermont-style civil unions," a legal status for same sex couples that paralleled that of

---

[17] Goodridge v. Dep't of Pub. Health, 798 N.E.2d 941 (Mass. 2003) (establishing the right of same-sex couples to marry in Massachusetts and giving the legislature six months to comply with the ruling).

marriage in all respects as to state law.[18] Those legal developments prompted a move among several states including Wisconsin for constitutional amendments that were intended to prevent similar judicial or legislative acts.[19] In the drafting files, a legislative memo by Rep. Mark D. Gundrum, one of the lead sponsors of the Amendment, described the Amendment as necessary because "nothing in our state constitution presently protects against our State Supreme Court from doing the same thing the Massachusetts Supreme Court did in 2003 (or [the] Vermont Supreme Court did in 1999 or the Hawaii Supreme Court did in 1993 . . .) and legislating from the bench to radically alter marriage in this state and judicially impose same-sex marriage on this state."

---

[18] Baker v. Vermont, 744 A.2d 864, 886 (Vt. 1999) (holding that the Vermont constitution entitled gay couples in Vermont to "the same benefits and protections afforded by Vermont law to married opposite-sex couples."). The following year, the Vermont legislature amended its statutes, creating what were later referred to in Wisconsin before and during the ratification process as "Vermont-style civil unions." Vt. Stat. tit. 15, §§ 1201-1207 (2000); see also Appling, 345 Wis. 2d 762, ¶59. Vermont's law explicitly provided that "[p]arties to a civil union shall have all the same benefits, protections, and responsibilities under law . . . as are granted to spouses in a civil marriage." Vt. Stat. tit. 15, § 1204 (2000).

[19] See Amy Rinard & Steven Walters, "Court endorses gay marriage[;] Senate Republicans vow to propose amendment banning same-sex unions," Milwaukee Journal Sentinel, Nov. 19, 2003, at 1A (discussing the reaction in the Wisconsin Senate to the Massachusetts ruling in Goodridge). See also Tom Heinen, "59% oppose gay unions, survey finds[;] Poll finds most notable rise among religious Americans," Milwaukee Journal Sentinel, Nov. 19, 2003, at 18A (discussing rising public opposition to same-sex marriage in the wake of the Massachusetts ruling).

¶11 In McConkey v. Van Hollen, we described the passage of the Wisconsin Marriage Amendment as follows:

> During both the 2003 and 2005 sessions, the Wisconsin State Assembly and Senate adopted a joint resolution to amend the Wisconsin Constitution. Though the 2003 and 2005 versions contained minor procedural variations, the text of the resolution itself was identical. Both versions of the resolution contained what the parties have referred to as the title: "To create section 13 of article XIII of the constitution; relating to: providing that only a marriage between one man and one woman shall be valid or recognized as a marriage in this state." The substance of the resolution contained two sections. Section 1 stated the text of the proposed marriage amendment. Section 2 of the resolution addressed the numbering of the new proposed amendment.
>
> Because the joint resolution was passed by two successive legislatures, the amendment was submitted to the people for ratification. Wisconsin voters were asked the following question:
>
> Marriage. Shall section 13 of article XIII of the constitution be created to provide that only a marriage between one man and one woman shall be valid or recognized as a marriage in this state and that a legal status identical or substantially similar to that of marriage for unmarried individuals shall not be valid or recognized in this state?
>
> On November 7, 2006, Wisconsin voters approved this amendment by a vote of 59 percent to 41 percent.

McConkey v. Van Hollen, 2010 WI 57, ¶¶ 7-8, 326 Wis. 2d 1, 783 N.W.2d 855, 858-59 (holding that there was no violation of the "separate amendment rule," the constitution's requirement that voters must be allowed to vote separately on separate amendments).

¶12 The subsequent passage of Chapter 770 established domestic partnerships and conferred certain rights and obligations:

> [I]n 2009, the Wisconsin legislature created a chapter in the Wisconsin statutes establishing domestic partnerships as an option for same-sex couples. Wisconsin Stat. ch. 770 contains eligibility requirements and prescribes the manner in which such partnerships are formed and terminated. Chapter 770 does not specify the rights and obligations of domestic partnerships. The mechanism the legislature chose for conferring rights and obligations was to select a subset of rights and obligations found in other parts of the statutes that already apply to marriages and then indicate, in the text of those other statutes, that they apply to domestic partnerships. For example, Wis. Stat. § 861.21(2), the statute assigning to a surviving spouse his or her decedent spouse's interest in their home, was made applicable to domestic partnerships.

Appling v. Doyle, 2013 WI App 3, ¶7, 345 Wis. 2d 762, 826 N.W.2d 666.

## PROCEDURAL HISTORY

¶13 In the circuit court, both Plaintiffs and Intervening Defendants moved for summary judgment. The circuit court for Dane County, Judge Daniel R. Moeser presiding, granted summary judgment to the Intervening Defendants.

¶14 The circuit court considered evidence from the legislative drafting files and from the ratification campaign, during which voters heard "messages . . . similar to [those] in the Marriage Amendment's drafting files." It quoted extensively from those materials, citing at least a dozen publications and

statements by Amendment proponents, which it said made clear that the repeated message to voters was that the second sentence of the Amendment was targeted at a "legally exact replica of marriage, but without the title" and that the Amendment was not intended to be "about benefits." It also compiled a list of benefits conferred by Ch. 770 and then a non-exhaustive list of more than 30 rights conferred by marriage that are not available to domestic partners. The circuit court rejected Plaintiffs' arguments that the Amendment's ratification reflected voters' intent "to further the general purpose of promoting a conjugal model of marriage."[20] Focusing on a comparison of the "legal status" of each relationship, the circuit court concluded that because "the state does not recognize domestic partnership in a way that even remotely resembles how the state recognizes marriage," and because domestic partners have "far fewer legal rights, duties, and liabilities in comparison to . . . [those] of spouses," the Plaintiffs had failed to carry their burden to prove the statute unconstitutional.

¶15 The court of appeals likewise addressed what the Amendment meant, considering the Dairyland sources, with reference to its plain language and the explanations given to

---

[20] See Appling, 345 Wis. 2d 762, ¶62 ("Appling explains that the 'conjugal model' is based on the premise that marriage is for sexual procreation and is 'child-focused.'")

voters during the ratification process about its meaning. It concluded that while the Plaintiffs had the burden to "show unconstitutionality beyond a reasonable doubt by persuading us that the voters who ratified the marriage amendment intended that it would ban the particular type of same-sex partnerships created by the domestic partnership law," they had fallen "far short of meeting [that] burden." Appling, 345 Wis. 2d 762, ¶¶4, 15.

## STANDARD OF REVIEW

¶16 This case comes to us on a summary judgment ruling, and it requires us to interpret a constitutional provision and a statute. "We do not review the circuit court's grant or denial of summary judgment under an erroneous exercise of discretion standard. Rather, our review is independent of the determination rendered by the circuit court, but we apply the same methodology." Tews v. NHI, LLC, 2010 WI 137, ¶40, 330 Wis. 2d 389, 793 N.W.2d 860 (citations omitted). We approach this in the same manner as the court of appeals, which noted that "[u]nder summary judgment methodology, '[i]f there is no dispute as to the material facts or inferences, . . . summary judgment is appropriate and we proceed to [resolve the dispute by considering] the legal issue or issues raised by the [summary judgment] motion.' Here there is no dispute about the facts and, accordingly, we focus on the parties' legal disputes and the

15

application of law to the undisputed facts." Appling, 345 Wis. 2d 762, ¶9 (citations omitted).

¶17 The interpretation of a constitutional provision is a question of law that we review de novo. Dairyland Greyhound Park, Inc., 295 Wis. 2d 1, ¶16. "The constitutionality of a statute is a question of law which we review de novo. In reviewing the constitutionality of a statute, 'there is a strong presumption that a legislative enactment is constitutional.'" Georgina G., 184 Wis. 2d at 515. "The party challenging the constitutionality of a statute 'must prove beyond a reasonable doubt that the act is unconstitutional.'"[21] Id. "Furthermore,

---

[21] Although our decision today addresses a facial challenge to the constitutionality of Chapter 770, we note that this court's review of facial challenges and as applied challenges is not identical. The burden of proof that challengers face, beyond a reasonable doubt, is the same in both facial and as applied constitutional challenges. See Soc'y Ins. v. Labor & Indus. Review Comm'n, 2010 WI 68, ¶27 , 326 Wis. 2d 444, 786 N.W.2d 385; Georgina G. v. Terry M., 184 Wis. 2d 492, 515, 516 N.W.2d 678 (1994). However, the presumption of constitutionality enjoyed by statutes, which is central to our analysis in addressing a facial challenge, is not applicable to our review of an as applied challenge. See Soc'y Ins., 326 Wis. 2d 444, ¶27.

In addressing the presumption of constitutionality afforded to statutes in the context of as applied constitutional challenges, we previously explained, "[w]hile we presume a statute is constitutional, we do not presume that the State applies statutes in a constitutional manner. Because the legislature plays no part in enforcing our statutes, 'deference to legislative acts' is not achieved by presuming that the statute has been constitutionally applied. As such, neither the challenger nor the enforcer of the statute face a presumption in an as-applied challenge." Id. (internal citations omitted).

'every presumption must be indulged to sustain the law if at all possible and, wherever doubt exists as to a legislative enactment's constitutionality, it must be resolved in favor of constitutionality.'" Id. (citations omitted).

ANALYSIS

¶18 Against that daunting standard, Plaintiffs have set themselves the task of proving beyond a reasonable doubt that Ch. 770, the domestic partnership law, is unconstitutional. We therefore examine whether they have proved beyond a reasonable doubt that Ch. 770 created a legal status identical to or substantially similar to that of marriage——the kind of legal status that the framers of the Marriage Amendment and the voters who adopted it intended to prohibit. We begin our discussion by identifying and applying the test that governs the analysis of the meaning of a constitutional provision; we then consider what legal status is given to Chapter 770 domestic partnerships and whether that legal status is one that the Amendment was meant to prohibit.[22]

---

[22] As the court of appeals noted, "This case is not about whether the Wisconsin or United States Constitutions require, on equal protection or other grounds, that same-sex couples have the right to a legally recognized relationship that is identical or substantially similar to marriage. To the contrary, for the domestic partnership law to pass muster here, the 'legal status' created by that law may not be 'substantially similar' to the 'legal status' of marriage." Appling, 345 Wis. 2d 762, ¶5. In other words, this case does not involve an attack on the constitutional amendment, Article XIII, Section 13, itself.

17

## I. WHAT TEST DO WE EMPLOY TO DETERMINE THE MEANING OF A CONSTITUTIONAL PROVISION?

¶19  The purpose of construing a constitutional amendment "is to give effect to the intent of the framers and of the voters who adopted it." State v. Cole, 2003 WI 112, ¶10, 264 Wis. 2d 520, 665 N.W.2d 328 (citations omitted).  Constitutions should be construed "so as to promote the objects for which they were framed and adopted." Id.  "We therefore examine three primary sources in determining the meaning of a constitutional provision: the plain meaning, the constitutional debates and practices of the time, and the earliest interpretations of the provision by the legislature, as manifested through the first legislative action following adoption." Dairyland Greyhound Park, Inc., 295 Wis. 2d 1, ¶19 (citations omitted).

¶20  Interpreting a constitutional amendment differs from interpreting a statute; we undertake a "more intense review" of extrinsic evidence when interpreting a constitutional provision:

> Our methodology in interpreting a constitutional provision envisions more intense review of extrinsic sources than our methodology in statutory interpretation. . . .
>
> The reasons we employ a different methodology for constitutional interpretation are evident. Constitutional provisions do not become law until they are approved by the people. Voters do not have the same access to the "words" of a provision as the legislators who framed those words; and most voters are not familiar with the debates in the legislature. As a result, voters necessarily consider second-hand explanations and discussion at the time of ratification. In addition, the meaning of words may evolve over time, obscuring the original meaning or purpose of a provision. The original meaning of a provision might be lost if courts could not resort to

18

extrinsic sources. Finally, interpreting a constitutional provision is likely to have a more lasting effect than the interpretation of a statute, inasmuch as statutory language can be more easily changed than constitutional language. Thus, it is vital for court decisions to capture accurately the essence of a constitutional provision.

Dairyland Greyhound Park, Inc., 295 Wis. 2d 1, ¶¶115-116 (Prosser, J., concurring in part and dissenting in part).

¶21 Of the three sources identified in Dairyland, the first two prongs are the most useful under the circumstances presented here: the plain meaning of the amendment, and the constitutional debates and practices of the time. We apply the third source——"the earliest interpretations of the provision by the legislature, as manifested through the first legislative action following adoption"——in a limited sense in a case such as this, where the challenge is to the constitutionality of "the first legislative action following adoption" itself. Dairyland Greyhound Park, Inc., 295 Wis. 2d 1, ¶49. In other words, in this case it would be potentially problematic to place significant weight on the legislature's enactment of Chapter 770 when interpreting the Marriage Amendment because the Plaintiffs' claim is that that first legislative action following the

Marriage Amendment, Chapter 770, violated the constitution.[23] In this context, a meaningful analysis is accomplished with an emphasis on the plain meaning of the Amendment and the constitutional debates and practices of the times as exemplified during the ratification process and limited reliance on the legislature's adoption of Chapter 770 itself.

A. WHAT IS THE PLAIN MEANING OF THE AMENDMENT?

¶22 To determine what the framers and the voters wanted the constitutional provision to accomplish we first look at the plain language and meaning of the amendment they ratified.

¶23 What is prohibited by the Marriage Amendment is "a legal status identical or substantially similar to that of marriage." Like the court of appeals, we "agree with [Plaintiffs] that, to properly assess the plain meaning of the term 'legal status,' that term must be viewed in context. The issue here is not the generic meaning of 'legal status,' but rather . . . its meaning as used in the constitutional phrase

---

[23] Appling argued that the shift in the political makeup of the Wisconsin legislature between the ratification of the Amendment and the enactment of Chapter 770 means that "the Legislature that approved Chapter 770 . . . was not a reliable interpreter of the Marriage Amendment." The court of appeals recognized this issue regarding the third source of Dairyland evidence about the meaning of a constitutional provision; it chose not to resolve the issue, partly on the grounds that "ignor[ing] the legislature's 'earliest interpretation' of the marriage amendment, namely the domestic partnership law" did not affect its ultimate conclusion. Appling, 345 Wis. 2d 762, ¶72. It noted that a finding that the legislature acted in defiance of the constitutional amendment, as Plaintiffs essentially suggested, "may conflict with the deference we are required to accord the legislature." Id., ¶71.

'[a] legal status identical or substantially similar to that of marriage.'" Appling, 345 Wis. 2d 762, ¶24. This is consistent with a "paramount rule of constitutional construction . . . that the intent of the provision 'is to be ascertained, not alone by considering the words of any part of the instrument, but by ascertaining the general purpose of the whole[.]' [W]hen the intent of the whole is ascertained, no part is to be construed so that the general purpose [is] thwarted . . . ." Dairyland Greyhound Park, Inc., 295 Wis. 2d 1, ¶24 (citations omitted). Another relevant principle here is that "language is read where possible to give reasonable effect to every word, in order to avoid surplusage." C. Coakley Relocation Sys., Inc. v. City of Milwaukee, 2008 WI 68, ¶17, 310 Wis. 2d 456, 750 N.W.2d 900.

¶24 Turning to the words, then, "legal status" means "the legal position of the individual in or with regard to the rest of the community." State v. Duket, 90 Wis. 272, 275, 63 N.W. 83 (1895). Status is "the sum total of a person's legal rights, duties, liabilities, and other legal relations, or any particular group of them separately considered." Black's Law Dictionary 1419 (7th ed. 1999). A legal right is "a right created or recognized by law." Id. at 1323. Rights, duties and obligations are important considerations, but a legal status can't be fully examined without considering its eligibility and formation requirements or constituent elements, because a legal status cannot be fully understood without understanding who can have it and what is necessary to obtain it.

21

¶25 To avoid surplusage, our analysis must also take into account and give meaning to the choice of the word "substantially" as a modifier of "similar." For the same reason, we take it that the use of "substantially similar" means that a status that is merely similar is not meant to be prohibited. (There is no contention by any party that the status of domestic partners is identical to that of marriage.)

¶26 The plain language of the Amendment indicates that the framers and the voters intended to prohibit a status that gives a domestic partner a sum total of legal rights, duties, liabilities, and other legal relations that is more than just similar to the sum total of a married person's legal rights, duties, liabilities, and other legal relations.

### B. WHAT INFORMATION WAS GIVEN TO VOTERS DURING THE CONSTITUTIONAL DEBATES AND RATIFICATION PROCESS?

¶27 The second source of information the Dairyland test directs us to consider is the content of the constitutional debates and practices of the time as exemplified during the ratification process. The ballot question that was presented to voters stated a question and provided the text of the proposed amendment:

> Ballot Question: "Marriage. Shall Section 13 of article XIII of the constitution be created to provide that only a marriage between one man and one woman shall be valid or recognized as a marriage in this state and that a legal status identical or substantially similar to that of marriage for unmarried individuals shall not be valid or recognized in this state?"

22

Text of Section: [Article XIII] Section 13. Only a marriage between one man and one woman shall be valid or recognized as a marriage in this state. A legal status identical or substantially similar to that of marriage for unmarried individuals shall not be valid or recognized in this state.

Wisconsin Blue Book 887 (2007-2008).

¶28 "This court presumes that, when informed, the citizens of Wisconsin are familiar with the elements of the constitution and with the laws, and that the information used to educate the voters during the ratification campaign provides evidence of the voters' intent." Dairyland Greyhound Park, Inc., 295 Wis. 2d 1, ¶37 (determining voter intent by examining public statements, news accounts, polls, news articles, and letters to the editor).

¶29 We therefore examine the relevant public statements made by the Amendment's framers and other proponents that were intended to persuade voters during the ratification process. During the process, the question of the effect on the rights of same-sex couples was a matter of intense debate. A newspaper article dated July 30, 2006, stated, "Although there's not much dispute that the proposed constitutional amendment on marriage in Wisconsin would bar same-sex unions, there is deep disagreement about what the wording might mean for civil unions and domestic-partner benefits." Stacy Forster, "Same-sex ban, different interpretations," Milwaukee Journal Sentinel, July 30, 2006, at 1B. In one letter to the editor of the Milwaukee Journal Sentinel, taking issue with an opponent's statements, Rep. Mark D. Gundrum characterized opponents as "continu[ing] the effort . . . to deceive people about the impact the man-

woman marriage constitutional amendment will have in Wisconsin" and flatly rejected the notion that it would "seriously jeopardize <u>any</u> legal protections for unmarried couples——gay or straight."   Rep. Mark D. Gundrum, "Opponents Resort to Deception, Fear," <u>Milwaukee Journal Sentinel</u>, August 6, 2006, at 2J. (Emphasis added.)   Proponents made numerous statements on that issue as the following facts demonstrate.

¶30  A January 28, 2004, press release on the letterhead of the Wisconsin Legislature by legislative sponsors who spearheaded the effort to pass the Amendment, Rep. Mark D. Gundrum and Sen. Scott Fitzgerald, stated:

> The proposed amendment, while preserving marriage as one man-one woman unions, would also preclude the creation of unions which are substantially similar to marriage. 'Creating a technical "marriage," but just using a different name, to massage public opinion doesn't cut it,' Gundrum said. . . .   Significantly though, the language does <u>not</u> prohibit the legislature [and other entities] . . . from extending particular benefits to <u>same-sex partners</u> as those legal entities might choose to do.

(Emphasis supplied for the words "same-sex partners.")

¶31  In December 2005, Sen. Scott Fitzgerald was quoted as follows in media accounts of legislative debates when the Senate was preparing to vote: "The second [sentence] sets the parameters for civil unions.   Could a legislator put together a pack of 50 specific things they would like to give to <u>gay couples</u>? Yeah, they could." (Emphasis added.)

¶32  A November 2006 statement issued by the office of Sen. Scott Fitzgerald struck back at opponents of the Amendment and

24

said they were "intentionally mislead[ing] the public about the amendment." Contrary to those "misleading" representations, the statement said,

> Nothing in the proposed constitutional amendment would affect the ability of same-sex individuals from visiting a sick partner in the hospital or mak[ing] medical decisions for their partners as [prescribed] by a medical power of attorney. The non-partisan Legislative Council has written that the proposed amendment does not ban civil unions, <u>only</u> a Vermont-style system that is simply marriage by another name. If the amendment is approved by the voters . . . the legislature will still be free to pass legislation creating civil unions if it so desires.

(Emphasis added.)

¶33 An article written by Sen. Scott Fitzgerald and published in the Wisconsin State Journal stated, "Contrary to claims from . . . liberal activists, the proposed constitutional amendment would not prohibit state or local governments . . . from setting up a legal construct to provide privileges or benefits such as health insurance benefits, pension benefits, joint tax return filing or hospital visitation to <u>same-sex or unmarried couples</u>." (Emphasis added.)

¶34 The Family Research Institute of Wisconsin, a group that advocated for the Amendment (it defined itself as seeking to preserve "traditional one-man/one-woman marriage in Wisconsin"), issued a six-page publication dated August 2006, listing 13 questions and answers about the meaning of the Amendment. In that publication, the organization stated, "The

second sentence [of the Amendment] doesn't even prevent the state legislature from taking up a bill that gives a limited number of benefits to people in sexual relationships outside of marriage, should the legislature want to do so." (Emphasis added.)

¶35 An article authored by Julaine Appling, a named plaintiff in this case, published Dec. 13, 2005, stated, "Contrary to the message being consistently given by opponents of the amendment, the second phrase does not 'ban civil unions.' . . . Nor does this phrase threaten benefits already given to people in domestic partnership registries by companies or local units of government."

¶36 In an Associated Press article dated Dec. 7, 2005, Julaine Appling was quoted as saying, "Nothing in the second sentence prohibits [legislative grants of adoption or inheritance rights]. Nor does it in any way affect existing benefits given by local governments or the private sector." J.R. Ross, "Senate approves amendment to ban gay marriage, civil unions," Associated Press, Dec. 7, 2005.

¶37 This representative sampling of messages, publicized by some of the most prominent and prolific advocates of the Amendment, makes clear that in response to concerns about what exactly the Amendment would prohibit, such advocates answered directly that the Amendment would not preclude a legislative

26

decision to create a legal mechanism giving unmarried couples in intimate relationships specific sets of rights and benefits. The message was also clearly given that the Amendment would not diminish rights in existing domestic partnerships. Same-sex partners were specifically included in such answers.

### C. WHAT LIGHT DOES THE LEGISLATURE'S ADOPTION OF CHAPTER 770 SHED ON THE MEANING OF THE MARRIAGE AMENDMENT?

¶38 The third source of information used to determine the meaning of a constitutional amendment is "the earliest interpretations of the provision by the legislature, as manifested through the first legislative action following adoption." Dairyland Greyhound Park, Inc., 295 Wis. 2d 1, ¶19. Review of legislation following a constitutional amendment has proved particularly useful, for example, in discerning the meaning of specific terms in a constitutional amendment. Payne v. City of Racine, 217 Wis. 550, 259 N.W. 437, 440 (1935) (discussing subsequent legislation to define the meaning of "public utility" in article XI, section 3 of the Wisconsin Constitution); State v. Beno, 116 Wis. 2d 122, 138, 341 N.W.2d 668 (1984) (adopting the court of appeals' reliance on legislative acts to understand the meaning of "civil process" as used in article IV, section 15 of the Wisconsin Constitution).

¶39 Analysis of the first legislation passed following the passage of an amendment, however, provides a limited benefit in

27

this case where we are tasked with resolving a challenge to the first law passed following the Marriage Amendment. We do find, however, that the legislature's careful drafting of Chapter 770 and its legislative declaration of policy in Wis. Stat. § 770.001 provide us with additional, yet limited, support for the proposition that the Amendment was not intended to prohibit the kind of domestic partnership created by Chapter 770.

¶40 During the drafting process, proponents of Chapter 770 carefully considered whether Chapter 770 would conflict with the Marriage Amendment. In doing so, proponents of Chapter 770 sought and received legal opinions and analysis considering possible conflicts between Chapter 770 and the Marriage Amendment. For example, members of the legislature and the governor considered legal opinions from the Wisconsin Legislative Council's Chief of Legal Services, Don Dyke, and University of Wisconsin Law School Professor David Schwartz, both of whom concluded that Chapter 770 did not violate the Marriage Amendment. After careful consideration during the drafting process, the legislature then chose to begin Chapter 770 with a declaration of policy. This declaration of policy, in part, states, "the legal status of domestic partnership as established in this chapter is not substantially similar to that of marriage. Nothing in this chapter shall be construed as inconsistent with or a violation of article XIII, section 13, of

28

the Wisconsin Constitution." In considering the third source from Dairyland, the legislature's careful consideration of the intersection of Chapter 770 and the Amendment along with its subsequent declaration of policy provide additional, but not dispositive, support for our conclusion today.

II.  WHAT KIND OF LEGAL STATUS DOES CHAPTER 770 CREATE?

¶41 Having set out the relevant evidence from the Dairyland factors, we now look at what kind of legal status Wis. Stat. Ch. 770 created.

¶42 We therefore look at what legal position a person in a domestic partnership is in "with regard to the rest of the community," Duket, 90 Wis. at 275, what rights and benefits there are that the law recognizes such status as having, who can have that legal status, and what is necessary to obtain it. This part of the discussion is fairly straightforward:  the definitions of legal status at issue are standard ones well known to the law and involve little more than a review of undisputed and uncontroversial facts about the statutory provisions concerning domestic partnerships and the statutory provisions concerning marriage.

¶43 Wisconsin   Stat.   § 770.01   defines   "domestic partnership" as "the legal relationship that is formed between 2 individuals under this chapter."  The declaration of policy at the beginning of Chapter 770 states simply, "The legislature

29

finds that it is in the interests of the citizens of this state to establish and provide the parameters for a legal status of domestic partnership.  The legislature further finds that the legal status of domestic partnership as established in this chapter is not substantially similar to that of marriage. Nothing in this chapter shall be construed as inconsistent with or a violation of article XIII, section 13, of the Wisconsin Constitution."[24]  Wis. Stat. § 770.001.  It does not identify the legal status as a contractual relationship.[25]  It does not impose a mutual and equal obligation upon the partners.[26]

¶44  Chapter 770 does not impose the same obligations on domestic partners as Wisconsin law imposes on married couples

---

[24] Compare Wis. Stat. § 765.001, discussing the legislative intent of marriage laws, which states in part, "Marriage is the institution that is the foundation of the family and of society. Its stability is basic to morality and civilization, and of vital interest to society and the state."

[25] Compare Wis. Stat. § 765.001, the legislative policy statement regarding marriage laws, which states in part: "The consequences of the marriage contract are more significant to society than those of other contracts, and the public interest must be taken into account always. . . . The impairment or dissolution of the marriage relation generally results in injury to the public wholly apart from the effect upon the parties immediately concerned.

[26] Compare Wis. Stat. § 765.001, which states in part, "Under the laws of this state, marriage is a legal relationship between 2 equal persons, a husband and wife, who owe to each other mutual responsibility and support. Each spouse has an equal obligation in accordance with his or her ability to contribute money or services or both which are necessary for the adequate support and maintenance of his or her minor children and of the other spouse."  (Emphasis added.)

under Wis. Stat. ch. 765 and elsewhere.  Marriage is unique in that it is an enforceable contract to which the state is a party. See Fricke v. Fricke, 257 Wis. 124, 126, 42 N.W.2d 500, 501 (1950) ("There are three parties to a marriage contract—the husband, the wife, and the state.").  Marriage carries with it an "equal obligation" that spouses "owe to each other mutual responsibility and support."  Wis. Stat. § 765.001(2). Once a couple is married, "the law steps in and holds the parties to various obligations and liabilities."  Maynard v. Hill, 125 U.S. 190, 211 (1888).

¶45 Chapter 770 makes no similar demand on domestic partners. Chapter 770 does not refer to a domestic partnership as a contract; it does not obligate domestic partners to satisfy a duty of "mutual responsibility and support."  While the Plaintiffs argue that this obligation can be read into ch. 770 from the co-habitation requirement, this argument is not persuasive given the specificity with which the legislature has chosen to articulate spousal obligations under Wis. Stat. Ch. 765 and elsewhere.

¶46  As we noted previously, Wis. Stat. § 770.05 sets forth the criteria for establishing a domestic partnership as follows:

> (1) Each individual is at least 18 years old and capable of consenting to the domestic partnership.

> (2) Neither individual is married to, or in a domestic partnership with, another individual.

31

(3) The 2 individuals share a common residence. . . .

(4) The 2 individuals are not nearer of kin to each other than 2nd cousins, whether of the whole or half blood or by adoption.

(5) The individuals are members of the same sex.

¶47 Terminating a domestic partnership does not require state approval, nor does it require the approval or consent of the second partner, and it can be dissolved automatically if either partner marries.[27]

¶48 The rights conferred are not listed in Chapter 770; rather, other statutes have been amended to add domestic partners to those whose rights are protected in various ways in specific contexts. As the court of appeals noted in its decision, The mechanism the legislature chose for conferring rights and

---

[27] Wis. Stat. § 770.12 states:

(1)(a) A domestic partner may terminate the domestic partnership by filing a completed notice of termination of domestic partnership form with the county clerk who issued the declaration of domestic partnership and paying the fee under s. 770.17. The notice must be signed by one or both domestic partners and notarized.

. . .

(4)(a) Except as provided in par. (b), the termination of a domestic partnership is effective 90 days after the certificate of termination of domestic partnership is recorded under sub. (3).

(b) If a party to a domestic partnership enters into a marriage that is recognized as valid in this state, the domestic partnership is automatically terminated on the date of the marriage.

> obligations was to select a subset of rights and obligations found in other parts of the statutes that already apply to marriages and then indicate, in the text of those other statutes, that they apply to domestic partnerships.   For example, Wis. Stat. § 861.21(2), the statute assigning to a surviving spouse his or her decedent spouse's interest in their home, was made applicable to domestic partnerships.

*Appling*, 345 Wis. 2d 762, ¶7.   Statutes that were amended include those governing victim notification (e.g., Wis. Stat. § 301.38(1)(a)), administration and transfer of a deceased individual's estate (Wis. Stat §§ 852.09, 861.33), health care records (Wis. Stat. § 146.81.(5)), power of attorney for health care (Wis. Stat. §  155.05), and family and medical leave (Wis. Stat. § 103.10).   The circuit court's decision noted that domestic partners are not included in other statutes granting specific rights to spouses; it listed a sampling of statutes granting rights, both large and small, accorded to spouses only.   Domestic partners, for example, do not have the marital property rights spelled out in Wis. Stat. Chapter 766.   They also are not permitted to obtain joint fishing licenses (Wis. Stat. 29.219(4)).

¶49 Other jurisdictions treat Wisconsin citizens in Chapter 770 domestic partnerships differently than they treat Wisconsin citizens in marriages.   The court of appeals observed that "[a]lthough Wisconsin recognizes marriages formed in other

33

jurisdictions, and Wisconsin marriages are likewise recognized in other jurisdictions, the same cannot be said of domestic partnerships. . . . When it comes to cross-jurisdictional recognition, marriages and domestic partnerships bear no resemblance." 345 Wis. 2d 762, ¶37.

¶50 That is underscored by the fact that domestic partnerships are not treated as equivalent to marriage, even where the federal government recognizes marriage without limiting it by gender. For example, some federal agencies now extend federal benefits to spouses in same-sex marriages as well as opposite-sex marriages (following the United States Supreme Court's ruling in United States v. Windsor, 133 S. Ct. 2675 (2013), which struck down one provision of the federal Defense of Marriage Act, 1 U.S.C. § 7). The Internal Revenue Service now recognizes marriages regardless of the gender of the spouses for tax filing purposes. See Rev. Rul. 2013-17, 2013-38 I.R.B. 201. ("For Federal tax purposes, the Service adopts a general rule recognizing a marriage of same-sex individuals that was validly entered into in a state whose laws authorize the marriage of two individuals of the same sex even if the married couple is domiciled in a state that does not recognize the validity of same-sex marriages."). But it does not recognize for tax-related purposes state-recognized domestic partnerships or their equivalents. See id. ("For Federal tax purposes, the term

34

'marriage' does not include registered domestic partnerships, civil unions, or other similar formal relationships recognized under state law that are not denominated as a marriage under that state's law, and the terms 'spouse,' 'husband and wife,' 'husband,' and 'wife' do not include individuals who have entered into such a formal relationship.").

### III. IS THIS THE KIND OF LEGAL STATUS THE MARRIAGE AMENDMENT WAS MEANT TO PROHIBIT?

¶51 Having set out the parameters of the legal status of domestic partnerships, we now arrive at the crux of the matter: have the Plaintiffs carried their burden to show beyond a reasonable doubt that the domestic partnership law violates Article XIII, Section 13 of the Wisconsin Constitution?

¶52 Keeping as our reference point the intent of the framers and the voters, we turn to that specific question. As we have noted, the plain language of the Amendment prohibits a legal status "identical or substantially similar to that of marriage." The public statements by proponents of the Amendment in the public debates leading up to ratification repeatedly emphasized the message that it would not prohibit anything other than something that was "marriage by another name." Thus, the plain meaning of "substantially similar" was defined for voters as something much more than similarities created by same-sex couples' obtaining a specified amount of rights. For example, as we noted previously, in a press release dated Nov. 2, 2006, Sen. Scott Fitzgerald issued a statement quoting "the non-

partisan Legislative Council" as writing that "the proposed amendment does not ban civil unions, <u>only</u> a Vermont-style system that is simply marriage by another name." (Emphasis added.) Without the further qualifications now advanced by the Plaintiffs, he gave to the voters he hoped to persuade the simple message that "only" the all-rights-included Vermont-style scheme would be prohibited.

¶53 Plaintiffs now argue that what makes the Vermont-style civil unions similar to the status in Chapter 770 is the nature of the relationships, not the rights conferred on them, and they argue that it is the intimate nature of the relationship "implicit in Ch. 770" that offends the constitutional provision by mirroring marriage.[28]  They aver that when they told voters that the Amendment would not stop the legislature from creating a mechanism to grant rights to non-married same-sex couples, what they meant was a kind of domestic partnership that would include "two brothers who live together and share household expenses, or a young woman who lives with and helps care for her

---

[28] At oral argument before this court, Plaintiffs asserted that their argument had not changed, that this interpretation had been the same all through the ratification process, and that when proponents asserted that Vermont-style civil unions would not be permitted by the Amendment, voters would have understood that Chapter 770-style domestic partnerships would not either because both impermissibly mirror marriage as intimate domestic relationships.

widowed grandfather."[29]  However, the statements quoted herein make it clear that during the constitutional ratification process, proponents explicitly mentioned same-sex intimate relationships when voters raised questions about what kind of relationship might legally be recognized if it passed. We have found no evidence in the record that proponents made the arguments to voters that they now say voters endorsed regarding Vermont-style unions, constituent elements of marriage, and consanguinity prohibitions and sex-specificity requirements. Adopting Plaintiffs' position would require us to believe that when voters heard the Marriage Amendment proponents, including its legislative sponsors, make public statements that the legislature could choose to bundle certain rights and give them to same-sex couples in civil unions, voters understood the unspoken remainder of that sentence to be "as long as those rights are not solely extended to same-sex couples but also extended to other pairs of people in domestic settings without

---

[29] It would theoretically be possible to sever portions of the statute if that portion rendered it unconstitutional. See, e.g., State v. Hezzie R., 220 Wis. 2d 360, 580 N.W.2d 660 (1998).  We note, however, that the statute itself contains no severability clause, and though there was a suggestion at oral argument that severing certain requirements in Chapter 770 might eliminate what Plaintiffs considered its impermissible substantial similarities to marriage, the argument is not sufficiently developed to make that a reasonable approach to be considered in this case.

37

regard to kinship or gender, such as siblings, grandparents and grandchildren, and opposite-sex couples."[30]

¶54 Plaintiffs' position cannot be squared at all with proponents' pre-ratification statements about non-marital sexual relationships and civil unions.  To follow Plaintiffs' logic, dropping the "specified gender" requirement would make Chapter 770 less similar to the constituent elements of marriage, but obviously dropping the requirement of a particular gender from Ch. 770 would make the status available to opposite-gender couples and consequently produce domestic partnerships that

---

[30] While plaintiffs identified six elements as "constituent elements" of marriage in their brief, that argument changed somewhat in oral argument before this court.  When asked by Justice Gableman for an example of a legal status that would be "not substantially similar" under Plaintiffs' reading of the Amendment, counsel gave the example of reciprocal beneficiary agreement which was described as follows:

> [It] has an age restriction-you're age 18-it does not have a sex specificity or a consanguinity requirement-that you're of competency to contract-and you are not in a marriage or other domestic legal status. That's it-those are the requirements. That's something that would encompass the examples that we mentioned in our brief, of a granddaughter living with a grandfather, or two sisters.

Of course, that legal status, as described, has four of the six "constituent elements," and is missing only the sex specificity requirement and consanguinity prohibition. When asked in a follow-up question whether it was accurate to state that the Plaintiffs' constitutional argument was concerned solely with the identified constituent elements and was unconcerned with the size of the "bundle of benefits and obligations" conferred on a legal status, counsel confirmed that was correct.

would appear to be even <u>more</u> similar to marriage in respect to the mix of genders and the capacity to bear children.

¶55 It is worth noting another point that undermines the contention that the legal status is defined with reference to marriage's "constituent elements," which is that the "constituent element" approach would appear to require us to find unconstitutional Wis. Stat. § 40.02, which defines domestic partners for purposes of determining eligibility for state employee benefits. Wisconsin Stat. § 40.02(21d) states:

> "Domestic partnership" means a relationship between 2 individuals that satisfies all of the following:
>
> (a) Each individual is at least 18 years old and otherwise competent to enter into a contract.
>
> (b) Neither individual is married to, or in a domestic partnership with, another individual.
>
> (c) The 2 individuals are not related by blood in any way that would prohibit marriage under s. 765.03.
>
> (d) The 2 individuals consider themselves to be members of each other's immediate family.
>
> (e) The 2 individuals agree to be responsible for each other's basic living expenses.
>
> (f) The 2 individuals share a common residence.

Wis. Stat. Ann. § 40.02. If we must strike down as being "substantially similar" to marriage any legal status that has too many of the six elements Plaintiffs identify as the constituent elements of marriage (relationships between two persons of specified sexes over a certain age who are not closely related, are competent to consent and are not married to someone else), the state's recognition of Chapter 40 domestic

39

partnerships for the purpose of granting state employee benefits surely seems to run afoul of that test. At oral argument, Plaintiffs were given an opportunity to respond to this question and merely noted that they were not challenging that provision and that the provision did not create the kind of statewide legal status that the Amendment prohibited. The problem it presents for Plaintiffs is that during the ratification process they never identified the Chapter 40 domestic partnership provision, which was in existence at the time, as conflicting with the "substantially similar" Amendment language. Some Plaintiffs clearly stated that existing benefits would not be affected,[31] yet the meaning they now ascribe to the Amendment would seem to invalidate Chapter 40, which has more characteristics in common with marriage than a Chapter 770 domestic partnership.

¶56 We know what the proponents told voters that the Amendment would mean, and we know that voters approved the Amendment. What the voters were told was that the Amendment did not mean that government entities, including the legislature, would be barred from "extending particular benefits to same-sex partners as those legal entities might choose to do."[32] That is

---

[31] See ¶25, supra (Rep. Mark D. Gundrum characterized opponents as "continu[ing] the effort . . . to deceive people about the impact the man-woman marriage constitutional amendment will have in Wisconsin" and flatly rejected the notion that it would "seriously jeopardize any legal protections for unmarried couples - gay or straight.").

[32] See ¶30, supra.

what the legislature did. The proper interpretation of a constitutional amendment is what framers and the voters who approved it thought it meant. The voters were told by proponents, including the framers of the Amendment, that same-sex couples could be granted rights notwithstanding the Amendment. The message given to the voters did not present the qualifications in regard to extending benefits that the Plaintiffs now claim.

CONCLUSION

¶57 For the reasons herein, we affirm the court of appeals' holding that Chapter 770 is constitutional, based on the presumption of constitutionality, the Plaintiffs' failure to meet the burden of proof, and the evidence we have reviewed in accord with the Dairyland decision, which establishes the framework we use to interpret constitutional provisions.

¶58 The plain language of the Amendment prohibits only a status "identical or substantially similar to" marriage, and by implication it does not prohibit what is not identical or substantially similar thereto. There are important statutory distinctions in the way the state treats marriage and domestic partnerships and important differences in the lists of benefits and obligations that inhere in the two types of relationships. In light of the totality of those differences, Plaintiffs have not overcome the presumption that Chapter 770 is constitutional.

¶59 Our conclusion is supported by evidence from the drafting and ratification process—evidence in the drafting files that the framers of the Amendment intended specifically to

41

allow legislation that provided a set of rights and benefits to same-sex couples. We are supported in our conclusion by evidence that voters were repeatedly told by Amendment proponents that the Amendment simply would not preclude a mechanism for legislative grants of certain rights to same-sex couples. We see no evidence that voters who approved the Amendment saw it as permitting those rights to be granted only in the kind of scheme Plaintiffs now suggest——that is, in cohabiting domestic relationships that bear no resemblance at all to marriage, with same-sex couples only as incidental beneficiaries. Of course the Amendment's opponents put out a different message to voters, but as the court of appeals noted, it makes sense to credit the notion, when the proponents prevail in a referendum, that theirs was the message that resonated with the majority of voters. Finally, our conclusion draws additional support, although limited, from the legislature's careful adoption of the first legislative act following the Amendment, adoption of Chapter 770 itself.

*By the Court.*—The decision of the Court of Appeals is affirmed.

¶60 SHIRLEY S. ABRAHAMSON, C.J. *(concurring).* The majority opinion correctly notes that the instant case does not address any challenge to Article XIII, Section 13 of the Wisconsin Constitution. Majority op., ¶1, n.3.

¶61 Although I agree with the majority opinion that Chapter 770 does not violate Article XIII, Section 13, the restriction of marriage to opposite-sex couples provided in Article XIII, Section 13 has been challenged in Wisconsin courts as unconstitutional.

¶62 This court recently declined to accept an original action challenging the constitutionality of Article XIII, Section 13 under the United States Constitution.[1] Recently, the federal district court for the Western District of Wisconsin declared Article XIII, Section 13, unconstitutional under the United States Constitution,[2] in line with other recent judicial decisions.[3]

---

[1] Halopka-Ivery v. Walker, 2014AP839-OA, slip op. (Wis. May 22, 2014) (denying the petition ex parte, with Abrahamson, C.J., and Bradley, J., dissenting).

[2] Wolf v. Walker, No. 14-CV-64-BBC, ___ F. Supp. 2d ___, 2014 WL 2558444 (W.D. Wis. June 6, 2014).

[3] See, e.g., Bostic v. Rainey, 970 F. Supp. 2d. 456, 470 (E.D. Va. 2014); Bishop v. U.S. ex rel. Holder, 962 F. Supp. 2d 1252, 1277 (N.D. Okla. 2014); Kitchen v. Herbert, 961 F. Supp. 2d 1181, 1195 (D. Utah 2013).

1

¶63  I write separately to call the reader's attention to these developments of the law.

¶64 PATIENCE DRAKE ROGGENSACK, J. *(concurring)*. I join the majority opinion's thoughtful discussion of the petitioners' challenge to Wis. Stat. ch. 770 and its reasoned decision that is well grounded in foundational legal principles. I write in concurrence to further discuss the presumption of constitutionality and the importance of the burden of proof that we must employ when a legislative enactment is challenged on constitutional grounds. I do so to illustrate that judicial decision-making is not based on whether the statute reviewed is grounded in a liberal legislative philosophy or in a conservative legislative philosophy. But rather, judicial decision-making is driven by foundational legal principles that require challengers to overcome the statute's presumption of constitutionality and to prove that the statute is unconstitutional beyond a reasonable doubt if their challenge is to succeed.

## I.  BACKGROUND

¶65 The petitioners request us to conclude that Wisconsin's domestic partnership law creates a "legal status" that is "substantially similar to that of marriage for unmarried individuals" contrary to the prohibition of Article XIII, Section 13 of the Wisconsin Constitution, which provides in its entirety:

> Marriage.  Section 13.  Only a marriage between one man and one woman shall be valid or recognized as a marriage in this state.  A legal status identical or substantially similar to that of marriage for unmarried individuals shall not be valid or recognized in this state.

1

II.  DISCUSSION

¶66  In order to prevail, petitioners must overcome the presumption that Wisconsin's domestic partnership law is constitutional and prove that it is unconstitutional beyond a reasonable doubt.  Tammy W-G. v. Jacob T., 2011 WI 30, ¶46, 333 Wis. 2d 273, 797 N.W.2d 854.  The proof that is required is not proof in an evidentiary sense, as we usually understand burdens of proof.  Rather, it is proof that "establishes the force or conviction with which a court must conclude, as a matter of law, that a statute is unconstitutional."  Dane County Dep't of Human Servs. v. Ponn P., 2005 WI 32, ¶18, 279 Wis. 2d 169, 694 N.W.2d 344.

A.  Standard of Review

¶67  Whether a statute is facially unconstitutional is a question of law that we independently review, and while we give no deference to prior court decisions, we do benefit from their analyses.  State v. McManus, 152 Wis. 2d 113, 129, 447 N.W.2d 654 (1989).

B.  Constitutional Challenges

1.  Judicial review

¶68  When we review a challenge to the constitutionality of a statute, we apply foundational legal principles to each case that comes before us.  For example, there is a general presumption that all legislative acts are constitutional.  Bostco LLC v. Milwaukee Metro. Sewerage Dist., 2013 WI 78, ¶76, 350 Wis. 2d 554, 835 N.W.2d 160.  The challenger must overcome this presumption.  Id.  The challenger also must prove that the statute is unconstitutional beyond a reasonable doubt.  GTE

2

Sprint Commc'ns Corp. v. Wis. Bell, Inc., 155 Wis. 2d 184, 192, 454 N.W.2d 797 (1990). The heavy burden that a challenger must meet is based on our respect for the legislature as a co-equal branch of government. Ponn P., 279 Wis. 2d 169, ¶16. Our procedures promote due deference to the legislature's constitutional function. Id. (citing State v. Cole, 2003 WI 112, ¶18, 264 Wis. 2d 520, 665 N.W.2d 328). This deference is grounded in the recognition that creating distinctions upon which public policies for the state are based is the legislature's constitutional prerogative. Doering v. WEA Ins. Group, 193 Wis. 2d 118, 132, 532 N.W.2d 432 (1995).

¶69 We resolve any doubt about whether a statute is constitutional by upholding the legislature's enactment. Cole, 264 Wis. 2d 520, ¶11. Therefore, it is insufficient for a challenger to show that the statute's constitutionality is doubtful or even that the statute probably is unconstitutional. Id.; Jackson v. Benson, 218 Wis. 2d 835, 853, 578 N.W.2d 602 (1998). Furthermore, given alternate interpretations of a statute, we employ the interpretation that will sustain its constitutionality. Am. Family Mut. Ins. Co. v. DOR, 222 Wis. 2d 650, 667, 586 N.W.2d 872 (1998). Stated otherwise, if it is shown that there are applications or interpretations of the statute that would be constitutional, the challenge will fail. Cole, 264 Wis. 2d 520, ¶30.

## 2. Application

¶70 The majority opinion carefully addresses petitioners' facial challenge to Wisconsin's domestic partnership law to determine whether that law creates a "legal status" that is

3

"substantially similar to that of marriage for unmarried individuals." It does so within the court's well-defined framework for analyzing facial constitutional challenges. First, the majority opinion accords the domestic partnership law "a strong presumption" that it is constitutional.[1] Second, the majority opinion holds the challengers to their obligation to overcome this presumption and to prove beyond a reasonable doubt that the law is not constitutional.[2] In the process that it applies, the majority opinion is consistent with the process applied by the court in Madison Teachers, Inc. v. Walker, 2014 WI 99, ¶76, __ Wis. 2d __, __ N.W.2d __, where the constitutionality of the 2011 budget repair bill, otherwise known as Act 10, was challenged.

¶71 In Madison Teachers, the majority opinion applies the same basic analytic framework as the majority opinion does here. It accords the same presumption of constitutionality to Act 10.[3] Madison Teachers also resolves any doubt about the constitutionality of Act 10 in favor of upholding the statute, by requiring plaintiffs to prove the law unconstitutional beyond a reasonable doubt, a burden they did not meet.[4]

¶72 Because understanding our decision today requires some appreciation of the foundational legal principles employed in

---

[1] Majority op., ¶17 (quoting Georgina G. v. Terry M., 184 Wis. 2d 492, 515, 516 N.W.2d 678 (1994)); see also ¶57.

[2] Id.

[3] See Madison Teachers, Inc. v. Walker, 2014 WI 99, ¶¶13, 76, __ Wis. 2d __, __ N.W.2d __.

[4] See id., ¶¶44, 73.

4

the judicial decision-making that attends facial constitutional challenges, I write to discuss that aspect of our decision, and accordingly, I respectfully concur.